**John Dean TAYLOR, Plaintiff,**

v.

**SECRETARY OF the NAVY and Robert C. Brown, Defendants.**

Civ. No. 90–2164.

United States District Court,
E.D. Pennsylvania.

May 4, 1994.

LOUIS H. POLLAK, District Judge.

## OPINION

This is an action brought by John Dean Taylor, a former federal employee of the Philadelphia Naval Shipyard ("PNSY"), against the Secretary of the Navy, Robert C. Brown, a former PNSY civilian police officer, and various other PNSY employees, alleging disability-based discrimination. On September 22, 1989, Taylor appealed to the EEOC the Navy's determination that his April 13, 1988 EEO complaint was without merit. On February 28, 1990, the EEOC rejected Taylor's claim of handicap discrimination and granted him leave to file a civil action. Taylor petitioned this court for appointment of counsel on March 28, 1990, and, on April 4, 1990, filed a pro se complaint alleging harassment by PNSY personnel since the time he injured his back in February 1986. After Taylor's motion for appointment of counsel was granted, Taylor, through his appointed counsel, filed an Amended Complaint on January 21, 1991.

The Amended Complaint was brought as a class action on behalf of Taylor and all others similarly situated. Count I of the first amended complaint is a claim under §§ 501 and 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.* and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* alleging that PNSY failed to accommo-

date Taylor's disability and discriminated against him because of it. Count II alleges retaliatory harassment against Taylor for filing a December 24, 1984 EEOC complaint, in violation of the Rehabilitation Act and Title VII. Count III seeks monetary damages from Brown for holding Taylor in custody against his will and depriving him of his right to counsel. Finally, counts IV, V and VI allege a conspiracy among various PNSY employees to deprive Taylor of his employment and workers' compensation benefits in violation of 42 U.S.C. § 1985.

In an opinion dated September 11, 1992, I addressed defendants' motion for partial dismissal. I dismissed counts IV, V, and VI of the Amended Complaint for failure to state a claim upon which relief may be granted. Pursuant to agreement of the parties, I struck Taylor's class action allegations and ruled that defendant Secretary of the Navy was the only proper defendant in counts I and II. I denied the defendants' motion in all other respects. Accordingly, the following counts remained after my September 11, 1992 opinion: (1) Count I, alleging handicap-based discrimination in employment by the Navy; (2) Count II, alleging retaliatory harassment by the Navy; and (3) Count III, alleging a constitutional tort committed by Brown.

In an opinion dated May 4, 1993, I considered the motion of the Secretary of the Navy for partial summary judgment, seeking summary judgment in the Secretary's favor on count I of the first amended complaint. The Secretary argued in that motion that, because Taylor was not qualified to work as a Rigger, the position for which he was hired, he could not prevail on count I. Taylor argued in response that the pertinent question was whether he was qualified to perform the light-duty jobs to which he was assigned after becoming handicapped. I agreed with Taylor's position and denied the Secretary's motion for partial summary judgment. *See Taylor v. Garrett*, 820 F.Supp. 933 (E.D.Pa. 1993).

Presently before this court is Taylor's motion for partial summary judgment against defendant Secretary of the Navy with respect to two claims included in Count I of Taylor's Amended Complaint, which asserts various claims under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* First, Taylor seeks summary judgment with respect to his claim that the Secretary, through the Philadelphia Naval Shipyard ("PNSY"), violated the Rehabilitation Act by failing to reassign him to an appropriate permanent position after he became disabled from returning to his job as a Rigger and instead assigning him to temporary details, including jobs inconsistent with his medical restrictions. Second, Taylor seeks summary judgment with respect to his claim that the Secretary, through PNSY, violated 32 C.F.R. § 56.8(a)(6), a Department of Defense regulation implementing the Rehabilitation Act, by sending criminal investigators to interview his physicians under circumstances in which criminal conduct was not at issue. Taylor seeks summary judgment with respect to liability only, leaving the measure of damages for the jury. The motion does not extend to Taylor's claims of failure to accommodate his handicap with regard to working conditions, harassment, constructive discharge, termination on pretext, or the constitutional tort claim against defendant Robert Brown, because these claims present disputed issues of fact or require an inference favorable to Taylor. *See* Taylor's Memorandum in Support of Motion for Partial Summary Judgment, at 2. For the reasons that follow, plaintiff's motion for partial summary judgment is granted in its entirety.

The Secretary of the Navy has filed a cross-motion arguing that Taylor should be precluded from seeking an award of compensatory damages and from introducing evidence relating to compensatory damages at trial because he failed to seek such relief in his complaint. For the reasons given in part III of this opinion, the Secretary's cross-motion is denied, and Taylor is granted leave to amend his Amended Complaint.

## I.

In connection with plaintiff's motion for partial summary judgment, the great bulk of the proffered evidence has come from plaintiff without refutation by the Navy. To the limited extent that the Navy has proffered

evidence, as distinct from legal arguments, I have accepted the Navy's version as true for purposes of this motion.

Plaintiff John Dean Taylor was hired as a Rigger Helper by the Philadelphia Naval Shipyard on October 6, 1980. In 1984, Taylor was promoted to the position of Rigger Worker. On February 4, 1986, while working at PNSY, Taylor suffered a back injury which the parties agree caused him to become a "handicapped individual" within the meaning of the Rehabilitation Act. No longer able to work as a Rigger, Taylor was placed on leave status and, on February 25, 1986, he began receiving benefits under the Federal Employees Compensation Act, 5 U.S.C. § 8101 et seq. ("FECA").

Taylor was totally disabled from working following the February 4, 1986 injury. On October 3, 1986, Taylor's physician, Dr. Schatzberg, indicated that Taylor could return to work in a light duty capacity. Taylor was then examined by a PNSY medical officer, who determined that Taylor was not able to return to work as a Rigger but was fit for desk work. A memorandum signed by T.M. Spilker, dated October 15, 1986, in Taylor's placement file describes his medical restrictions as "[i]ndefinite over six (6) months," indicates that he was not capable of performing "grade controlling duties,"[1] and requests job placement or separation. Plaintiff's Exhibit 43.1.

From February 2 to March 5, 1987, Taylor worked at PNSY driving a car for the Compensation Service Division. On March 6, 1987, Taylor was involved in an altercation with his supervisor and claimed a reaggravation of his back injury. PNSY contested Taylor's claim for disability benefits but the Office of Workers' Compensation Program approved Taylor's claim. According to a Compensation Investigation Report, Jacqueline Karns (now Jacqueline Anastasia), a manager in the Compensation Services Division, requested an investigation to determine the validity of Taylor's claim for recurrence of his injury. On March 19, 1987, an investigator interviewed Dr. Schatzberg regarding his diagnosis and treatment of Taylor. On April 16, 1987, the investigator called Dr. Schatzberg for follow-up information. The synopsis of the report concluded that Taylor's recurrence was medically documented and that Dr. Schatzberg would not return Taylor to work at the present time, even in a light duty status.

In May 1987, Taylor came under the care of Dr. Avart. Dr. Avart's July 16, 1987 report determined that Taylor could work on a part time basis, and that he would be able to work on a full time basis in four to eight weeks. On September 29, 1987, Franklin P. Hatton, PNSY Superintendent in Charge of Compensation, sent Taylor a Job Offer for Unclassified Duties in the Design Division, as a temporary detail from the position of Rigger. On October 9, 1987, Taylor was examined by the PNSY medical officer who found Taylor fit for the Design Division position, but unfit for rigger work at that time. Dr. Avart approved the Job Offer on October 23, 1987.

On October 19, 1987, Taylor returned to work at PNSY in the position of Rigger Worker in Shop 72, detailed to the Design Division for a period not to exceed February 10, 1988. Taylor's position in the Design Division involved photocopying and running errands, working conditions that were consistent with Taylor's medical restrictions. This detail ended on February 11, 1988, and a new employee was hired to replace Taylor in the Design Division.

On February 11, 1988, Taylor was detailed to Unclassified Duties in the Planning Office for a period not to extend beyond February 29, 1988. Like the job in the Design Division, the Planning Office job was an office position consistent with Taylor's medical restrictions. This detail ended on February 29, 1988, and Taylor was returned to Shop 72, the Rigger Shop where Taylor had been employed before his injury.

In Shop 72, Taylor was first asked to work in the tool room of an aircraft carrier, handing out equipment. Taylor indicated that he could not perform that work because it involved heavy lifting. Taylor was then as-

---

1. I understand this phrase, which is not defined, to refer to the duties that an employee must be able to perform in order to avoid reclassification at a lower grade.

signed to inspect crane cables. This job involved twisting cables, working outside, and walking long distances, conditions inconsistent with Taylor's medical restrictions. Taylor complained to his supervisor, Hatton, who advised Shop 72 to relieve Taylor from his cable inspection job because the work was incompatible with his physical restrictions. Taylor was assigned temporarily to Shop 39, the Excess Manpower Shop, until a new detail was approved.

On March 2, 1988, Dr. Avart examined Taylor and discharged him from treatment. Dr. Avart's report, dated March 18, 1988, included restrictions on lifting, standing, walking, climbing stairs, twisting, fine manipulation, and reaching above the shoulder. The Rigger Shop foreman sent Hatton a job description for Taylor dated March 4, 1988, for a Housekeeping position which involved picking up debris in the industrial areas. On March 23, after reviewing Dr. Avart's March 18 report, Hatton sent a memorandum to Taylor informing him that he was assigned to the Housekeeping position effective March 28, 1988. Also on March 28, 1988, Taylor was examined by the PNSY medical officer, who imposed restrictions on bending, stooping, leaning, crawling, and climbing ladders, ropes and staging, in addition to the restrictions included in Dr. Avart's report.

Taylor took the Housekeeping job description to Dr. Avart, who wrote another report dated March 25, 1988.[2] The March 25 report incorporated the physical restrictions in the March 18 report and added restrictions on climbing ladders, kneeling, bending, stooping, and exposure to cold weather (below 40 degrees). This report also stated that Taylor was "unable to do rigging, needs job reclassification." In a report dated March 28, 1988, the PNSY medical officer reiterated the restrictions in his March 23 report, stated that Taylor's restrictions were to be considered permanent, and recommended reclassification.

On March 30, 1988, as a result of Dr. Avart's March 25 report, the Housekeeping assignment was canceled and Taylor was assigned to Unclassified Duties in Shop 39, the Excess Manpower Shop. Also on March 30, 1988, Karns, of the Compensation Services Division, requested an investigation of John Taylor. The request states:

> Please have an investigator take the attached PHILABSY-5100/27 forms to Dr. Avart and require [sic] as to why within one weeks [sic] time he changed Mr. Taylor's restrictions? This request is a priority case & request action ASAP. Verbal response with a written follow-up would be acceptable.

*See* Plaintiff's Exhibit 70. The investigator, Tillman Hahn, interviewed Dr. Avart at his office on March 31, 1988. Dr. Avart sent Hatton a letter, dated April 1, 1988 and received on April 15, 1988, stating that the Housekeeping position appeared to be within Taylor's restrictions, as long as lifting was limited to ten pounds, there was no repetitive bending, stopping, kneeling or squatting, and Taylor was not required to work outside or in cold or damp weather.

On April 12, 1988, Taylor was assigned to the Purchasing Department. He was one of three workers selected to perform work that involved telephoning vendors to get the best price for merchandise that PNSY intended to buy. Taylor learned the job within a few days, and his supervisor was pleased with his performance. On April 18, Taylor was removed from the job in Purchasing and reassigned to the Housekeeping position, in spite of the fact that his supervisor in Purchasing wanted to keep him.[3]

PNSY never issued a new written job description for the Housekeeping position to incorporate Dr. Avart's additional restrictions. Taylor was required to work outside in all kinds of weather, and the job required repetitive stooping and heavy lifting—re-

---

**2.** There is a dispute about what Taylor told Dr. Avart was the reason he needed a supplemental report; however, this dispute is not relevant to the pending motion.

**3.** The Secretary of the Navy states that Taylor's contention that his supervisor wanted to keep

him "is unsupported and untrue." Response of the Secretary of the Navy, at 10 n. 4. Taylor documents his contention by referring to his own verified statement; the Secretary of the Navy offers no evidence to contradict Taylor's position.

quirements inconsistent with his medical restrictions.

During the time Taylor was working in the Housekeeping position, he did not have a treating physician. In July 1988, Taylor became a patient of Dr. LeRoy. In his July 13, 1988 report, Dr. Leroy recommended that Taylor work in an office job. On July 14, Taylor was evaluated by the PNSY medical officer who also recommended office work. As a result of Dr. LeRoy's report, PNSY detailed Taylor to a position as a receptionist in the Public Works Administration on July 15, 1988.

In his January 4, 1989 reevaluation of Taylor, Dr. LeRoy continued to recommend office work and noted that Taylor's restrictions were permanent. Taylor was evaluated by the PNSY medical officer on January 5, 1989. The medical officer indicated that Taylor should work in an office job only and recommended that Taylor be reclassified.

Effective January 17, 1989, the position in the Public Works Office was filled on a permanent basis, and Taylor was returned to Shop 72, the Rigger Shop. Upon his return to Shop 72, Taylor was assigned to a portable enclosure that functioned as a temporary field office for Shop 72 supervisors. This office was located in a loft in the industrial area. On January 20, 1989, Taylor reported the change in his work assignment to Dr. LeRoy, who provided a certificate of medical restrictions recommending transfer out of the industrial area. Taylor was evaluated on January 23 by the PNSY medical officer, who also recommended that Taylor be transferred out of the industrial area, and who again recommended reclassification.

In a letter to Dr. LeRoy dated January 23, 1989, Hatton rejected the recommendation that Taylor be assigned outside of the industrial area. Hatton enclosed with the letter a copy of a statement of Vincent Agostino, Shop 72 Foreman, describing Taylor's duties as answering the telephone and taking messages. In fact, Taylor's duties were not limited to answering the phone and taking messages, but also included splicing ropes.

On September 28, 1989, Taylor's supervisor, Timothy O'Leary, advised Taylor that his work location was being changed from the portable office to a wire mesh tool cage in the loft. The explanation given for this change was that debris from the rope splicing job was creating a hazard in the office.

Taylor took personal leave for the day and did not return to PNSY after that date. On October 16, 1988, Taylor came under the care of a psychiatrist, Dr. D'Orazio, who determined that Taylor was unable to return to work at the time because of job-related stress. That day, O'Leary requested an investigation to determine whether Taylor was under the care of a physician. On October 25, 1989, Taylor provided PNSY with a medical excuse note from Dr. D'Orazio indicating that Taylor was unable to work for emotional reasons. On October 31, 1989, an Employee Relations Specialist requested an investigation to confirm the validity of the medical excuse note. The investigation report indicates that, on November 6, 1989, a criminal investigator visited Dr. D'Orazio. The investigator spoke with a secretary, who assured him that the note was valid and that Taylor was under Dr. D'Orazio's care.

Effective December 14, 1989, Taylor's employment at PNSY was terminated on grounds of filing two false claims against the government.[4] Plaintiff's contention that the dismissal was a pretext to terminate his employment on the basis of his disability is not addressed in the motion before the court today.

## II.

Taylor claims that the Navy discriminated against him based on handicap in violation of §§ 504 and 501 of the Rehabilitation Act. Section 504 of the Rehabilitation Act provides in relevant part:

No otherwise qualified individual with handicaps in the United States ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to

---

4. The first incident involved an alleged effort by Taylor to obtain a replacement paycheck to which he was not entitled. The second incident involved a claim by Taylor that he was entitled to disability benefits after being struck by a bottle tossed by another employee.

discrimination under any program or activity receiving Federal financial assistance or * * * by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a) (1988). As the Supreme Court explained in *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), an "otherwise qualified" person in the employment context is one who is able to perform the essential functions of the job in question. *See id.* at 287 n. 17, 107 S.Ct. at 1130–31 n. 17 (citations omitted). The Court qualified this definition by requiring "reasonable accommodation" on the part of the employer:

> When a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any "reasonable accommodation" by the employer would enable the handicapped person to perform those functions. Accommodation is not reasonable if it either imposes "undue financial and administrative burden" on a grantee, *Southeastern Community College v. Davis*, [442 U.S. 397, 412, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1979) ], or requires a "fundamental alteration in the nature of [the] program," *id.* at 410[, 99 S.Ct. at 2369].

*Arline*, 480 U.S. at 487 n. 17, 107 S.Ct. at 1242–43 n. 17. *See also Nelson v. Thornburgh*, 567 F.Supp. 369, 379–82 (E.D.Pa. 1983), *aff'd without op.*, 732 F.2d 147 (3d Cir.1984). The employer has the burden of proving inability to accommodate a handicapped employee and/or that accommodation would impose an undue hardship on the agency. *See Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1387 (3d Cir.1991); *Prewitt v. United States Postal Service*, 662 F.2d 292, 308 (5th Cir.1981).

Section 501 of the Act, 29 U.S.C. § 791, which applies only to federal employers rather than to federal grantees generally, goes beyond § 504's reasonable accommodation requirement by requiring federal employers to take affirmative action with respect to employment of the handicapped. Specifically, § 501(b) requires each agency to submit "an affirmative action program plan for the hiring, placement, and advancement of handicapped individuals" that describes "the extent to which and methods whereby the special needs of handicapped employees are being met." The plan is reviewed annually to determine that it provides "sufficient assurances, procedures and commitments to provide adequate hiring, placement, and advancement opportunities for handicapped individuals."

In the present motion, Taylor contends that the Navy failed to make reasonable accommodation of his handicap because: (1) PNSY assigned Taylor to a series of temporary details, including some positions inconsistent with his medical restrictions, rather than assigning him to an appropriate permanent position; and (2) PNSY sent criminal investigators to interview Taylor's physicians, although criminal conduct was not at issue. I will address these arguments in turn.

**A.** *Failure to reassign to a permanent position*

In my May 4, 1993 opinion, I observed:

> In its pretrial memorandum, the Navy described its reassignment procedure at PNSY as follows:
>
>> It was the practice at PNSY to make reasonable accommodation for employees with light-duty work restrictions by referring the employees to shops for temporary assignments. PNSY made no permanent light duty assignments.
>
> Defendant's Pretrial Memorandum at 4. Still there is no factual basis in the record demonstrating (1) that this is the Navy's policy with respect to accommodation of handicapped workers (as alleged); (2) why permanent light-duty assignments are resisted; (3) whether there were any permanent positions at the PNSY consistent with Taylor's medical restrictions during the years in question; (4) whether a different policy with respect to permanent light-duty assignments would impose an undue hardship on the Navy.

*Taylor v. Garrett*, 820 F.Supp. 933, 938 (E.D.Pa.1993). The evidence submitted in support of Taylor's motion for partial summary judgment reveals that, from October 7, 1977 until at least June 11, 1985, it was the

policy of PNSY either to reassign a permanently disabled employee to a permanent position consistent with that employee's medical abilities or, if no such position was available, to separate the employee from service on the basis of disability. After June 11, 1985, PNSY began to hire employees receiving FECA benefits who were not totally incapacitated on a temporary basis and to subject them to periodic verification of physical limitations. Taylor argues, among other things, that PNSY's practice of placing handicapped employees in temporary details rather than permanent positions violates §§ 504 and 501 of the Rehabilitation Act. Taylor contends that he is entitled to summary judgment with respect to this claim because the Navy has not offered evidence that such an accommodation would pose an undue hardship.

PNSY's general policy regarding reassignment and reclassification of disabled workers is set forth in PHILANAVSHIPYD INSTRUCTION 12460.1A, Exhibit 75 to Plaintiff's Motion. This policy, dated October 7, 1977, applies to all PNSY employees working under medical restrictions, regardless of whether the restrictions were caused by a job-related injury. Under the policy, employees working under medical restrictions are described as being in a Restricted Duty Status. Employees in a Restricted Duty Status for less than six months are regarded as being in a Temporary Restricted Duty Status, unless a PNSY medical officer determines that the restrictions are permanent. Employees who are in Restricted Duty Status for more than six months are automatically regarded as being in a Permanent/Indefinite Restricted Duty Status, unless a PNSY medical officer determines that the medical restrictions will be lifted within sixty days of the scheduled termination of Temporary Restricted Duty Status.

Under the 1977 policy, an employee in Temporary Restricted Duty Status who is unable to perform "grade controlling duties" of his or her official job/position description "will be temporarily detailed to other work in the Shipyard, if available, which is consistent with [his or her] qualifications and duty restrictions." Plaintiff's Exhibit 75, ¶ 4(c). An employee in Permanent/Indefinite Restricted Duty Status who is capable of performing the "grade controlling," but less than the full range of, duties of his or her job description "will be reassigned to a job/position description consistent with [his or her] actual duties." Plaintiff's Exhibit 75, ¶ 4(e). An employee in Permanent/Indefinite Restricted Duty Status who is not able to perform the "grade controlling duties" of his or her regular position "will be offered placement in another vacant position at the same or lower level, if available, consistent with [his or her] highest level of qualification and duty restrictions." Plaintiff's Exhibit 75, ¶ 4(g). If no such position is available, "separation by appropriate voluntary or involuntary procedures will be effected." *Id.*

In a policy memorandum dated May 14, 1985, the Navy announced a policy intended to remove ex-Naval shipyard workers from the Office of Workers' Compensation Program ("OWCP") Periodic rolls—that is, to reduce the number of ex-Naval shipyard workers receiving FECA benefits. *See* Plaintiff's Exhibit 82.1. The memorandum explained that several thousand former Naval shipyard workers were receiving FECA benefits but performing no work for the Navy, and that the Navy must reimburse the Department of Labor for the benefits paid. The memorandum postulated that some of these former workers could perform and would accept useful work they were capable of doing if such work were offered. In addition, the memorandum noted that workers who refused such work would be removed from the OWCP rolls. Accordingly, the memorandum established a policy for immediate implementation by all Naval shipyards to: (1) determine the physician-validated work capabilities of all ex-workers on the OWCP rolls; (2) tailor a job specifically to the capability of the individual and offer that job through proper official channels; (3) employ individuals who accept offers; (4) remove from the OWCP rolls those individuals who refuse offers of suitable employment. *See id.* The rationale behind tailoring specific jobs to ex-workers receiving FECA benefits was, as explained in the memorandum, that the Navy was already paying full disability pay to such individuals.

In a memorandum dated June 11, 1985, PNSY described the policy it believed to be an appropriate response to the May 14, 1985 Navy directive. *See* Plaintiff's Exhibit 82.2. The June 11 memorandum provided that PNSY would not establish additional positions to accommodate ex-PNSY workers on the OWCP rolls. *See id.*, ¶ 1(a). Instead, PNSY would establish separate registers for employees on the OWCP rolls who were qualified for, and physically capable of performing the duties of, existing positions. *See id.*, ¶ 1(b). PNSY would also require each department and office to identify existing positions that require minimal physical activity and, if appropriate, modifications of position descriptions that would create more positions for persons on the OWCP rolls. *See id.*, ¶ 1(c). The memorandum concluded that "[e]mployees so hired should be considered handicapped, hired on a temporary basis and subjected to periodic verification of physical limitations." *Id.*, ¶ 1(d).

PNSY's Reemployment Program, whose goal was to remove seventy-three individuals from the OWCP rolls, was implemented in the fall of 1987. *See* Plaintiff's Exhibits 82.6, 82.7. The November 9, 1987 policy memorandum describing how the Reemployment Program would be implemented directed departments and offices to identify positions within their authorized staffing that could be used for the reemployment of returning injured workers. *See* Plaintiff's Exhibit 82.6, ¶ 2. The memorandum explained that "[s]election of an existing position should consider that the primary skills of most of the individuals are production-related and that these employees will have permanent restrictions/limitations." *Id.* If existing positions could not accommodate the restrictions/limitations, the memorandum directed that new positions be created. *See id.* Among other things, the memorandum noted that "[t]he position(s) [designated for the reemployment program] does not have to be permanent; and may be temporary; it must, however, be at least of a 90 day duration." *Id.*, ¶ 3(a).

It is apparent from the foregoing discussion that, in promulgating and implementing its Reemployment Program, PNSY modified the policy described in the October 7, 1977 memorandum. The 1977 policy—which, as explained above, applied to individuals working under medical restrictions, regardless of whether the injury was job-related or not—contemplated that only individuals with temporary restrictions would be given temporary details. Individuals with permanent or indefinite medical restrictions would be reassigned to an appropriate vacant position or, if no such position was available, separated from service. In contrast, PNSY's Reemployment Program—which applied only to ex-workers receiving FECA benefits—contemplated assigning some workers with medical restrictions to a series of temporary positions and subjecting them to periodic verification of medical restrictions.

Taylor argues that PNSY's practice of assigning workers recalled from OWCP rolls to a series of temporary details rather than assigning them to permanent positions violates §§ 501 and 504 of the Rehabilitation Act. Taylor contends that he is entitled to summary judgment with respect to this claim, because the Navy has not offered evidence to show that accommodating handicapped workers by assigning them to permanent rather than temporary positions would have been unreasonable or that it would have constituted an undue hardship.

In addressing Taylor's Motion for Partial Summary Judgment, the Navy does not respond directly to Taylor's arguments. The Navy does not argue or point to evidence in support of the proposition that placing employees with permanent or indefinite medical restrictions in appropriate permanent positions rather than in a series of temporary details would impose an undue hardship on the Navy. Instead, the Navy argues that Taylor's job assignments may not be reviewed by this court.

### 1. *Statutory preclusion of review*

■ The Navy first argues that this court is statutorily prohibited from reviewing FECA-based light-duty job assignments under the Rehabilitation Act. Relying on 5 U.S.C. § 8124 of FECA, the Navy contends that Congress provided that the Secretary of Labor determines all issues regarding compensation, including the suitability of light-

duty assignments. Citing § 8128(b), the Navy contends that "[o]n these issues, the Secretary's decision is final and 'not subject to review by another official of the United States or by a court or [sic] mandamus or otherwise.'" Defendant's Response, at 2. The Navy further argues:

> If the Rehabilitation Act authorized courts to review job assignments in the way that plaintiff alleges here, the statutory scheme would be negated—plaintiffs would be permitted to have a judge or jury pass upon the appropriateness of a particular light duty assignment, and potentially obtain damages in those situations where the factfinder disputed the appropriateness of a job assignment.

Defendant's Response, at 2.

I find unpersuasive the Navy's argument that § 8128(b)2 precludes, in this context, judicial review of light-duty assignments determined to be suitable by the Secretary of Labor.[5] The Secretary's role in determining the suitability of offers of reemployment arises under 5 U.S.C. § 8106(c)(2), which provides that a partially disabled employee who refuses or neglects to work after suitable work is offered to him is not entitled to compensation. Section 8128 provides:

> (a) The Secretary of Labor may review an award for or against payment of compensation at any time on his own motion or on application. The Secretary, in accordance with the facts found on review, may—
>
> (1) end, decrease, or increase the compensation previously awarded; or
>
> (2) award compensation previously refused or discontinued;
>
> (b) The action of the Secretary or his designee in allowing or denying a payment under this subchapter is—
>
> (1) final and conclusive for all purposes and with respect to all questions of law and fact; and
>
> (2) not subject to review by another official of the United States or by a court by mandamus or otherwise.

5 U.S.C. § 8128. By its own terms, § 8128(b), the section that makes the Secretary's determinations unreviewable, applies only to decisions to allow or deny FECA benefits. The Navy contends, however, that allowing judicial review of the Secretary's decisions regarding light-duty job assignments "would undermine the exclusivity of the Secretary's authority to determine all issues regarding FECA compensation." Defendant's Response, at 13. But the Third Circuit has found no merit in a very similar argument made in a closely analogous context. In *Miller v. Bolger*, 802 F.2d 660 (3d Cir.1986), the Third Circuit said:

> We reject the Postmaster General's argument that allowing Miller to pursue Title VII remedies will usurp the Secretary of Labor's power under 5 U.S.C. § 8128(b) to make final and unreviewable determinations of FECA benefits. Quite simply, this court is in no way impinging on the Secretary's authority. The Secretary has determined that Miller should receive FECA benefits and has determined the amount. Those determinations are not at issue here. They cannot affect the federal courts' jurisdiction, granted by Congress under Title VII, to consider Miller's claim for additional and different relief.

*Miller*, 802 F.2d at 666. As in *Miller*, the Secretary's determinations regarding Taylor's entitlement to FECA benefits are not at issue in the case at bar. Accordingly, they cannot affect this court's jurisdiction, granted by Congress under the Rehabilitation Act, to consider Taylor's claim for additional and different relief.

> 2. *Preclusion of review based on available FECA procedures and remedies*

■ The Navy also argues that Taylor is not entitled to summary judgment because he "was provided with both the benefits of the FECA program and with a procedure for challenging Shipyard actions under FECA for nearly four years." Defendant's Response, at 2. The Navy does not elaborate on its reasoning, but appears to be contend-

---

**5.** The Navy claims that each of Taylor's job assignments was approved by the Secretary of Labor, or by his designee. Taylor argues that this claim is unsupported. For the purpose of decid- ing the motion before the court, I will assume arguendo that the Secretary of Labor, or his designee, approved each of Taylor's job assignments.

ing that FECA provides a procedure for challenging the suitability of job assignments which precludes a FECA beneficiary from bringing a challenge to the appropriateness of his job assignments under the Rehabilitation Act. The Navy cites no precedent to support this proposition, and the proposition is not one that intrinsically carries conviction. For the reasons given below, the FECA procedures and remedies are inadequate substitutes for the procedures and remedies under the Rehabilitation Act.

As explained above, the role of the Secretary of Labor in determining the suitability of offers of reemployment arises under 5 U.S.C. § 8106(c)(2), which provides that a partially disabled employee who refuses or neglects to work after suitable work is offered to him is not entitled to compensation. The procedures followed by the Department of Labor Office of Workers' Compensation Program, which administers the FECA program, are described in Chapter 810 of the Federal Personnel Manual, at § 8–4. *See* Plaintiff's Exhibit 73. OWCP evaluates a job offer and, if it determines that the offer is for suitable employment, it so notifies the employee in writing and indicates that the employee must accept the job or show reasonable cause for refusal. An employee who accepts the job has no subsequent opportunity under FECA to challenge the suitability of that job. If an employee refuses the job and OWCP determines that the employee had reasonable cause for refusing, FECA benefits continue while further attempts at placement are made. If an employee refuses the job and OWCP concludes that the employee did not have reasonable cause for refusing, FECA benefits are terminated. *See id.*

Only when FECA benefits are terminated for refusal to accept an employment offer that OWCP has found to be suitable is a formal decision issued; such a decision is subject to administrative appeal under 5 U.S.C. § 8124. FECA does not provide for a continuation of benefits pending appeal. To be sure, an employee who prevails on appeal is entitled to FECA benefits retroactive to the date of termination. But the scope of the successful appeal is confined to the issue of FECA benefits. It does not result in place-

ment of the employee in a suitable position or enable the employee to invoke other remedies—such as an award of compensatory damages—available under the Rehabilitation Act. Accordingly, I reject the Navy's argument that FECA procedures preclude an employee from challenging the suitability of a job assignment under the Rehabilitation Act.

Finally, the Navy protests that, assuming Taylor's claim of entitlement to a permanent assignment has merit, Taylor does not identify when such entitlement accrued. The Navy argues that Taylor could not be found entitled to such an assignment prior to January 1989, when the PNSY medical officer recommended that Taylor be reclassified. *See* Defendant's Response, at 15. However, as Taylor points out, the March 28, 1988 report of the PNSY medical officer states: "These restrictions are considered permanent. Reclassification is recommended." Plaintiff's Exhibit 30. Moreover, the PNSY's 1977 policy applied to workers with medical restrictions deemed either permanent or indefinite. A memorandum in Taylor's placement file dated October 15, 1986 describes Taylor's medical restrictions as "indefinite (over six months)" and requests job placement or separation. Plaintiff's Exhibit 43.1.

■ For the reasons given above, I find none of the arguments made by the Navy persuasive. The Navy neither argues nor offers evidence to show that assigning Taylor to a permanent position would have been unreasonable or would have imposed an undue hardship on the Navy. The fact that, from 1977 until at least 1985, PNSY had a policy of reassigning workers with permanent or indefinite medical restrictions to appropriate permanent jobs is substantial evidence that such a policy is a reasonable accommodation and does not create an undue hardship. In addition, the fact that full-time employees were hired to replace Taylor in his Design Division position and in the Public Works Office is evidence that permanent positions consistent with his medical restrictions were available. Accordingly, Taylor is entitled to summary judgment on his claim that the Navy violated §§ 501 and 504 of the Rehabilitation Act by assigning him to tem-

porary details rather than to an appropriate permanent position after it became apparent that his medical restrictions were indefinite.

### B. *Use of criminal investigators*

■ Taylor also seeks summary judgment with respect to his claim that PNSY violated 32 C.F.R. § 56.8(a)(6), a Department of Defense regulation implementing § 504 of the Rehabilitation Act, by sending criminal investigators to interview Taylor's physicians under circumstances in which criminal conduct was not at issue.

As explained above, § 504 of the Rehabilitation Act provides that a qualified handicapped individual shall not, solely by reason of his or her handicap, be excluded from participation in, be denied the benefits of, or be subject to discrimination under, any program or activity receiving federal financial assistance. Unlike § 501, § 504 reaches PNSY's treatment of Taylor outside the workplace, during times when he could not work at all and was eligible for FECA benefits.

The individual agencies police § 504 and promulgate their own regulations. The Department of Defense ("DoD") has promulgated regulations implementing § 504 that apply to PNSY as a "DoD Component." The DoD regulations provide in relevant part:

> [A] DoD Component may not use, directly or indirectly, through contractual or other arrangements, criteria or methods of administration that . . .
>
> (ii) Defeat or substantially impair accomplishment of the objectives of the . . . DoD Component's program or activity with respect to handicapped persons.

32 C.F.R. § 56.8(a)(6).

Although federal agencies have an interest in controlling FECA costs because they must reimburse OWCP for its FECA expenditures, the provisions of FECA are remedial and non-adversary in character. 20 C.F.R. § 10.140. Federal employers may not prevent or deter employees from applying for FECA benefits, and such conduct is subject to criminal penalties. 20 C.F.R. § 10.23(c). Section 504 of the Rehabilitation Act, as implemented by 32 C.F.R. § 56.8(a)(6), requires

DoD Components, such as PNSY, to administer their FECA programs to accomplish the objectives of FECA with respect to handicapped persons with job-related injuries.

According to the uncontradicted deposition testimony of Ms. Daliessio, a union steward who has represented hundreds of handicapped employees, PNSY assumes that 90% of all compensation claims are fraudulent. Daliessio testified that it is common for employees with valid job-related injuries to have their compensation claims identified as questionable or not job-related. She also testified that it is standard practice for criminal investigators to harass injured employees and their doctors. *See* Plaintiff's Exhibit 9.

According to the uncontradicted deposition testimony of defendant Robert Brown, formerly a member of the PNSY civilian police force, PNSY police officers have law enforcement powers that include the power to make arrests. *See* Plaintiff's Exhibit 8, at 78. PNSY has established a section of its criminal investigation service which specializes in compensation cases. Each investigator carries a badge and card identifying the investigator as a "Criminal Investigator." *See* Plaintiff's Exhibit 72.

Brown testified that the PNSY Investigation Compensation Division is used to investigate the validity of an employee's injury when there is no evidence of fraud or other criminal behavior. *See* Plaintiff's Exhibit 8, at 29. If asked to investigate a compensation case, criminal investigators regularly make personal visits to the injured worker and his or her physician. If, as a result of these contacts, an injured worker returns from compensation status to work at PNSY, the investigator includes in his or her report a calculation of the projected savings for the Shipyard. *See id.* at 72–77.

According to Brown, the purpose of the investigator's visit is simply "to establish when the individual may be returned at some type of a capacity to the shipyard." Plaintiff's Exhibit 8, at 74. Brown denies that the investigators seek to influence a doctor's decision about when an employee can return to work. *See id.* at 75. However, PNSY's COP/Compensation Investigation Policy suggests that the personal visits by criminal

investigators are calculated to influence the doctor's decision. *See* Plaintiff's Exhibit 83. The policy recommends that criminal investigators visiting a physician:

Present your credentials to the doctor after meeting him/her. This way he/she will be confident you are an authorized agent of the federal government.

*Id.* at 17. The policy explains:

Your initial contact with the doctor will provide you with an opportunity to explain the Shipyards' [sic] Compensation Program. It is important to emphasize the costs incurred by the shipyard for the injured employee compensation program, our attempts to return the employee to work in either a limited or regular duty status (availability of light duty) and the implications the shipyard faces if the cost of compensation continues to increase. Many times the doctor will return an employee to limited duty if he feels certain that the employee will be working within the restrictions stipulated by the doctor. Conversely, if the doctor feels he is being pressured or is unsure if you are being honest with him, you will not gain his confidence or cooperation. The working relationship you develop with a certain physician and/or medical facility will form the basis for any future business you may conduct, therefore, a good working relationship is essential.... *Id.* at 16.

Remember, the doctor is the key person involved with insuring the intergrity [sic] of the compensation program. His/her cooperation or lack thereof will have a direct correlation on the success you have in returning injured workers to a work status at the shipyard. The doctors' main objection to returning employees' to work is commonly stated as a fear of a malpractice suit if the employee reinjures him/her self while in a limited duty status. Do everything within your power to assure the doctor that all recommended medical restrictions for the patient will be strictly adhered to.

*Id.* at 17.

In his motion for summary judgment, Taylor contends that the Navy must justify PNSY's use of personal interviews by crimi-nal investigators—rather than, for example, use of telephone interviews, correspondence or personal interviews by civil investigators—to investigate his claims of injury. As described in detail above, Taylor argues that criminal investigators interviewed his physicians on three occasions when criminal conduct was not at issue. First, according to a Compensation Investigation Report dated April 11, 1987, an investigator interviewed Dr. Schatzberg to determine the validity of Taylor's claim of reinjury. Second, on March 31, 1988, an investigator interviewed Dr. Avart to determine why within one week's time Dr. Avart changed Taylor's medical restrictions. Third, on November 6, 1989, an investigator visited the offices of Dr. D'Orazio to confirm the validity of Taylor's medical excuse note.

In its response, the Navy concedes that Taylor's allegations with respect to the use of criminal investigators state a claim under the Rehabilitation Act, but contends that the record does not support Taylor's allegations. *See* Defendant's Response, at 4. However, the Navy addresses only the first of the three instances described by Taylor as occasions on which criminal investigators were used to interview his physicians despite the absence of evidence of criminal conduct. The Navy argues:

The first incidence [sic] of this conduct is alleged to have occurred on March 19, 1987, in connection with an investigation into the validity of Taylor's claims for recurrence of his back injury in the driving job. See Plaintiff's Exhibit 69. The investigative report states that the injury was requested by J. Karns, a supervisor in the compensation department (although the plaintiff's exhibit does not include a copy of Ms. Karns request, which is identified in the report as Enclosure 1.). As this claim followed two physical confrontations on consecutive days involving Taylor inside the compensation office, which led to Taylor being charged with two counts of disorderly conduct, Karns was justified in requesting an investigation into the validity of the compensation claim. At a minimum, a fact-finder should be entitled to hear Ms. Karns' testimony to determine whether the

investigation was based on reasonable cause or some discriminatory motive. Defendant's Response, at 17–18.

The Navy's response is unpersuasive for a number of reasons. First, it seems to suggest that discriminatory motive is required to establish a violation of § 504 of the Rehabilitation Act. In fact, where a challenged practice has a disparate impact upon the handicapped, proof of discriminatory animus is not required to establish a violation of § 504. *See Alexander v. Choate,* 469 U.S. 287, 297, 105 S.Ct. 712, 718, 83 L.Ed.2d 661 (1985). Taylor's motion documents PNSY's general practice of using criminal investigators to interview physicians treating employees receiving FECA benefits. The language quoted above from PNSY's COP/Compensation Investigation Policy establishes that this practice is intended to enlist the "cooperation" of physicians in returning such employees to work. Some physicians—one has no way of knowing how many—would doubtless find an interview setting of this kind intimidating. And, bearing in mind that this deployment of criminal investigators occurs in the context of employees who have been disabled by job-related injuries, it is apparent that the practice is one which has a disparate impact on handicapped persons.

Second, although the Navy suggests that Karns in fact suspected criminal activity and was therefore justified in requesting that a criminal investigator interview Dr. Schatzberg, the Navy offers no evidence to support that position. The investigative report dated April 16, 1987 notes that on March 6, 1987, Taylor was involved in an altercation with his supervisor, and that the altercation was the subject of a separate investigation. *See* Plaintiff's Exhibit 69. The April 16 report does not suggest that Taylor was suspected of fraud or other criminal activity with respect to his claim of reinjury, and the Navy has not offered an affidavit of Karns to the effect that she has reason to suspect criminal conduct. Accordingly, Taylor is entitled to summary judgment with respect to his claim that the Navy violated § 504 of the Rehabilitation Act by using criminal investigators to interview Dr. Schatzberg about the validity of his claim of reinjury.

Finally, the Navy does not respond at all to Taylor's claims with respect to the use of criminal investigators to interview Dr. Avart and Dr. D'Orazio. Therefore, Taylor is entitled to summary judgment with respect to his claims that the Navy violated § 504 by sending criminal investigators to interview these two doctors.

For the foregoing reasons, Taylor's motion for partial summary judgment is granted in its entirety.

## III.

■ The Secretary of the Navy has filed a cross-motion in which it argues that Taylor should be precluded from seeking compensatory damages and from introducing evidence at trial relating to compensatory damages because he failed to request such relief in his complaint. Taylor argues that he effectively requested compensatory damages in his Amended Complaint, and that, at a minimum, he should be permitted to file a second amended complaint to cure any deficiency.

Although the decision to grant or deny a motion to amend a complaint is within the sound discretion of the district court, Rule 15 of the Federal Rules of Civil Procedures provides that leave to amend "shall be freely given when justice so requires." *See Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3d Cir.1984). The *Howze* court explained that "delay alone . . . is an insufficient ground upon which to deny a motion to amend. Rather, the touchstone is whether the non-moving party will be prejudiced if the amendment is allowed." *Id.*

Taylor's Amended Complaint, filed January 22, 1991, provides the factual basis for Taylor's compensatory damages claim. Paragraph 24 alleges:

As a result of the discriminatory and unfair treatment set forth above, Plaintiff was required to expend over two thousand dollars ($2,000.00) for defense in criminal prosecutions; has lost wages and benefits, including medical coverage for himself and his family; and has suffered exacerbation of his physical condition, as well as emotional injury.

Paragraph 19 of Count I incorporates Taylor's verified statement, which is attached as Exhibit A to the Amended Complaint. Under the heading "Relief Requested," the verified statement states: "I want to be compensated for my lost income, expenses, and the pain I have suffered...." Amended Complaint, Exh. A, at 20. The prayer for relief does not include a specific request for compensatory damages, but does request "such other relief as may be appropriate." Finally, Taylor's Pretrial Memorandum, filed December 8, 1992, includes compensation for emotional injury as part of the relief requested under Count I. *See* Taylor's Pretrial Memorandum, at 20. The Supplemental Pretrial Memorandum of the Secretary of the Navy, filed May 19, 1993, recognized that Taylor was requesting compensatory damages and responded by demanding a jury trial.

It is apparent from this discussion that the Navy should not have been surprised to learn that Taylor was planning to seek compensatory damages, and that the Navy has not been prejudiced by Taylor's failure to demand compensatory damages explicitly in his pleadings. For these reasons, the Secretary's cross-motion is denied, and Taylor is granted leave to file a second amended complaint in which to request an award of compensatory damages.

### IV.

For the foregoing reasons: (1) Taylor's motion for summary judgment with respect to his claim that the Secretary of the Navy, through PNSY, violated §§ 501 and 504 of the Rehabilitation Act by assigning him to temporary details rather than to a permanent position is granted; (2) Taylor's motion for summary judgment with respect to his claim that the Secretary of the Navy, through PNSY, violated 32 C.F.R. § 56.-8(a)(6), a Department of Defense regulation implementing the Rehabilitation Act, by sending criminal investigators to interview his physicians where criminal conduct was not at issue, is granted; (3) the motion of the Secretary of the Navy to preclude Taylor from requesting compensatory damages and from introducing evidence relating to compensatory damages is denied; and (4) Taylor's motion for leave to file a second amended complaint is granted.