Tommy L. MORRIS, Plaintiff,

v.

James G. ROCHE, Secretary of the Air Force, Defendant.

No. 5:95–CV–450–2 (DF).

United States District Court,
M.D. Georgia,
Macon Division.

Jan. 30, 2002.

Robert E. Bergman, Warner Robins, GA, for plaintiff.

Melanie D. Wilson, Asst. U.S. Atty., Macon, GA, for defendant.

## OPINION

FITZPATRICK, District Judge.

This case involves a claim brought under the Civil Service Reform Act of 1978 and the Rehabilitation Act of 1973 by Tommy L. Morris against James G. Roche, Secretary of the Air Force, in his official capacity only.[1] Specifically, Plaintiff claims that he was discriminated against on the basis of a disability that was caused by a work-related injury to his right knee in 1991. Plaintiff is seeking (1) reinstatement; (2) back pay and front pay (including prejudgment interest and the value of lost employment benefits, such as pension and other fringe benefits, step increases, seniority, and retirement benefits); (3) an injunction prohibiting any disability discrimination against Plaintiff; (4) compensatory damages for physical and emotional pain and suffering; (5) punitive damages; (6) attorney fees, costs, and expenses; and (7) disciplinary action against the employees who discriminated against him. Before the Court is Defendant's motion for summary judgment (tab # 16).

## I. STANDARD OF REVIEW

The Supreme Court has observed, "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under Rule 56, summary judgment must be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. Thus, summary judgment is proper if there is insufficient evidence for a jury to return a verdict for the non-moving party or, in other words, if a factual dispute could not be reasonably resolved in favor of either party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the non-moving party, but the court may not make credibility determinations or weigh the evidence. *See id.* at 249, 106 S.Ct. 2505.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, de-

---

1. At the time Plaintiff filed the complaint, the Secretary of the Air Force was Sheila E. Widnall, but Dr. Widnall vacated that position on October 31, 1997. Dr. Roche was sworn in as the twentieth Secretary of the Air Force on June 1, 2001. Thus, because this is an official-capacity action only, the Court has substituted Dr. Roche for Dr. Widnall. *See* Fed. R.Civ.P. 25(d)(1).

positions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548 (internal quotation marks omitted). If the moving party discharges this burden, the burden then shifts to the non-moving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact or that the moving party is not entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(e); *see also Celotex Corp.,* 477 U.S. at 324–26, 106 S.Ct. 2548. This evidence must consist of more than mere conclusory allegations or legal conclusions. *See Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir.1991). Under this scheme, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548.

## II. FACTUAL BACKGROUND

Plaintiff was, and is now again, a preference-eligible, competitive-service employee working as an auditor with the Air Force Audit Agency at Robins Air Force Base in Warner Robins, Georgia. On September 17, 1991, Plaintiff suffered a work-related injury to his right knee for which he received benefits, including medical benefits and wage loss compensation, under the Federal Employees' Compensation Act. On October 11, 1991, Plaintiff's treating physician, Dr. Steve Barnes, prescribed certain restrictions on his work-related activities, including prohibitions on bending, stooping, climbing, and crawling, as well as limitations on prolonged standing and walking.

When Plaintiff returned to work, these restrictions inhibited his ability to perform his regular duties as an auditor because he was often required to perform physical tasks that exceeded his limitations. Plaintiff underwent surgery on his knee on December 5, 1991, and returned to work on March 16, 1992. To accommodate him upon his return to work, Plaintiff was assigned "light duty" work and was given a part-time assistant to help him gather information.

On May 29, 1992, Plaintiff temporarily left his job in anticipation of a second knee surgery, which occurred on June 25, 1992. Plaintiff was not released to return to work until November 12, 1992. Upon his return to work, Plaintiff was expected to perform the essential functions of his job with a few limitations. Although Plaintiff claims that he was able to perform the essential functions of his job, he admits that he was unable to perform all the physical tasks associated with gathering information and documentation needed to implement the survey and audit programs. Plaintiff's physical limitations were accommodated insofar as his desk was moved to the building where he performed audits, he was excused from staff meetings held on the third floor of that building, and he was given a handicapped parking permit. Plaintiff responds that the new building was so large that he was still required to walk up to three miles per day, that attendance at the meetings from which he was excused was not an essential function of his job, that he was physically unable to attend those meetings because they were held on the third floor of a building that did not have an elevator and he was prohibited from climbing stairs, and that he was given a handicapped parking permit only after he initiated the process. Defendant claims that

Plaintiff was granted extra time to complete his audits, but Plaintiff contends that his time was never actually increased.

After Plaintiff's second surgery, he was not provided with an assistant to help him complete his work. Plaintiff claims that the agency refused to accommodate him further because it revised its previous position concerning the physical requirements of Plaintiff's job such that the job was described as "sedentary in nature." Between November 13, 1992, and April 1993, Plaintiff completed only one audit (though he started a second assignment in late March or early April), and he often complained to his supervisor that he was physically unable to perform certain aspects of his job. During this time, Plaintiff received a scheduled award for 10% permanent, partial impairment of his right knee, which covered the period from November 12, 1992, to June 1, 1993.

On April 13, 1993, Dr. Barnes examined Plaintiff again and modified his medical restrictions to limit his walking to between the parking lot and his desk. Dr. Barnes also told him that he needed to have somebody else bring him the information and documentation needed for his audits. In a memorandum dated May 4, 1993, an Air Force physician, Dr. Gary Lebow, disagreed with the restrictions recommended by Dr. Barnes the previous month. Initially, the agency made no changes to Plaintiff's duties in response to Dr. Barnes's recommendation; instead, Plaintiff was required to submit to an examination by Dr. Lebow. Dr. Lebow examined Plaintiff on September 16, 1993, and concluded that he satisfied the medical requirements of his job. Because of the contradictory conclusions reached by Dr. Barnes and Dr. Lebow, the agency requested that Dr. Barnes re-examine Plaintiff to determine whether his April 13, 1993 recommendation still applied. After Dr. Barnes reaffirmed his original conclusion in February 1994, the agency requested that another Air Force physician, Dr. John R. Marsh, re-examine Plaintiff (Dr. Lebow had left the Air Force by that time). Dr. Marsh examined Plaintiff on March 10, 1994, and concurred with Dr. Barnes's assessment that Plaintiff did not satisfy the medical requirements of his job. Based on the agreement between Dr. Barnes and Dr. Marsh, the agency altered Plaintiff's responsibilities so that he was conducting only referencing assignments, which required less mobility than other assignments.

Thereafter, Plaintiff requested that the agency accommodate him by providing him with an assistant to help him complete his work, as he was following his first surgery. The agency rejected Plaintiff's request as unreasonable because it considered field work and mobility to be essential functions of the job and because employing two people to perform one job was an undue hardship. Instead, Defendant claims that the agency offered to accommodate Plaintiff by providing him with a mobility device, such as a wheelchair, so he could perform field work. However, Plaintiff disputes Defendant's assertion that assigning two people to perform one job was an undue hardship because that was not an unusual practice for the agency. Moreover, Plaintiff disputes Defendant's assertion that the agency offered him the use of a mobility device. In fact, Plaintiff claims that medical personnel at RAFB wrote a letter indicating that Plaintiff would not be qualified to perform his job even with a wheelchair.

On February 17, 1995, the agency notified Plaintiff of a proposal to terminate him on the ground that he was unable to

perform the essential functions of his job. Plaintiff responded to that notice on March 8, 1995. On March 21, 1995, the agency notified Plaintiff of the decision to terminate him, effective March 24, 1995. Plaintiff appealed that decision to the Merit Systems Protection Board on April 14, 1995. The MSPB, through Administrative Judge Richard P. Klein, upheld the agency's decision in an initial decision dated August 15, 1995, and that decision became final on September 19, 1995. Plaintiff then timely appealed the MSPB's final decision to this Court on October 18, 1995. Plaintiff's complaint alleges that the agency intentionally discriminated against him, and terminated him, because of his disability and that the agency failed to reasonably accommodate his disability.

Plaintiff resumed receiving FECA benefits on March 25, 1995, the amount of which is disputed. Also, the Office of Workers' Compensation Programs subsequently evaluated Plaintiff for his ability to return to work as an auditor. Based on that evaluation, the agency offered Plaintiff his former job on September 27, 1999. The OWCP approved this offer as suitable. Although Plaintiff initially disputed his ability to return to work, he eventually accepted the offer after the OWCP advised him that his FECA benefits would terminate if he refused. Plaintiff returned to work under protest on February 28, 2000, and he has been working since that date. Defendant maintains that Plaintiff's job requires mobility, but Plaintiff's walking is still restricted to between the parking lot and his desk. As a result, the agency has limited Plaintiff's duties to handicap-accessible buildings and has accommodated Plaintiff by providing him with a motorized scooter. Plaintiff's FECA benefits have been terminated because he has returned to work, but he has appealed that decision to the OWCP.

## III. DISCUSSION

Defendant offers the following arguments in support of his motion: (1) FECA provides Plaintiff's sole remedy; (2) any recovery Plaintiff receives should be reduced by the amount of benefits he has already received under FECA; (3) Plaintiff cannot recover back pay for the time period during which he was unable or unwilling to work; (4) Plaintiff's claims for reinstatement and front pay are moot; (5) Plaintiff was not a "qualified individual" under the Rehabilitation Act during the relevant time period; (6) Plaintiff could not have performed the essential functions of his job even with a reasonable accommodation; (7) the accommodation requested by Plaintiff was unreasonable; and (8) Plaintiff's claim under the CSRA must fail because the MSPB's decision to terminate him is overwhelmingly supported by the evidence. Before addressing Defendant's arguments, the Court will take a moment to ascertain exactly what claims Plaintiff is asserting and how he is asserting them.

The complaint purports to assert two claims: one under the CSRA and one under the Rehabilitation Act. Indeed, the manner in which the parties have briefed Defendant's motion supports a two-count interpretation of the complaint. Unfortunately, Plaintiff did not separate the complaint into counts; instead, he simply alleges in two paragraphs entitled "Preliminary Statement" and "Statement of Claims" that Defendant violated the CSRA and the Rehabilitation Act. However, characterizing the complaint as brought in two counts would be an oversimplification that misunderstands the statutory scheme established by the CSRA. As a result, and because the Eleventh Circuit has published so few opinions involving the CSRA, the Court

finds it necessary to outline its understanding of the statutory and regulatory framework established by the CSRA.

Prior to 1978, the civil service system consisted of an " 'outdated patchwork of statutes and rules built up over almost a century.' " *United States v. Fausto,* 484 U.S. 439, 444, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) (quoting S.Rep. No. 95–969, at 3 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2723, 2725). When the CSRA was enacted in 1978, *see* Pub.L. No. 95–454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.A. (West 1996 & Supp.2001)), it " 'comprehensively overhauled the civil service system,' and created an elaborate 'new framework for evaluating adverse personnel actions against [federal employees].' " *Lee v. Hughes,* 145 F.3d 1272, 1274 (11th Cir.1998) (quoting *Lindahl v. Office of Pers. Mgmt.,* 470 U.S. 768, 773, 774, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985)) (alteration in original) (citation omitted). The CSRA "prescribes in great detail the protections and remedies applicable to such action, including the availability of administrative and judicial review." *Fausto,* 484 U.S. at 443, 108 S.Ct. 668; *see also* 2 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 1547–63 (3d ed.1996). Civil service employees are divided into three classifications: (1) the Senior Executive Service, *see* 5 U.S.C.A. § 2101a; 5 U.S.C.A. § 3132(a)(2); (2) the competitive service, *see* 5 U.S.C.A. § 2102; and (3) the excepted service, *see* 5 U.S.C.A. § 2103. *See Fausto,* 484 U.S. at 441 n. 1, 108 S.Ct. 668. "Within each of the three classifications of employment, the [CSRA] accords preferential treatment to certain veterans and their close relatives—so-called 'preference eligibles.' " *Id.* (citing 5 U.S.C.A. § 2108). The protections and remedies to which an employee is entitled depends on his classification and whether he is preference-eligible. *See id.* at 445–47, 108 S.Ct. 668 (discussing the various protections and remedies available to certain employees).

An employee in the competitive service, such as Plaintiff, may be terminated "only for such cause as will promote the efficiency of the service." 5 U.S.C.A. § 7513(a). When termination of an employee in the competitive service is proposed, the employee is entitled to (1) "at least 30 days' advance written notice"; (2) "a reasonable time … to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer," or a hearing, at the agency's discretion; (3) representation by counsel or some other person; and (4) "a written decision and the specific reasons therefor." 5 U.S.C.A. § 7513(b), (c).[2] After the employee is terminated, his options for contesting the agency's decision depend on whether he alleges that discrimination was a basis for the decision. If, as in this case, the employee alleges that a basis of the agency's decision was discrimination, "he may *either* immediately file suit in a district court *or* pursue an administrative procedure." *Doyal v. Marsh,* 777 F.2d 1526, 1535 (11th Cir.1985); *see also* 5 U.S.C.A. § 7702(a)(2).[3] If the employee elects the administrative route, as Plaintiff

---

2. The administrative record indicates that Plaintiff was afforded these protections. In any event, he has not argued otherwise.

3. If the employee does not allege that a basis of the agency's decision was discrimination, his only avenue for relief is an appeal to the MSPB followed by a further appeal to the Federal Circuit. *See* 5 U.S.C.A. §§ 7701, 7703.

did in this case, he may appeal the agency's decision to the MSPB. *See* 5 U.S.C.A. § 7513(d).[4] The MSPB must sustain the agency's decision if it is supported by a preponderance of the evidence, unless the employee shows that the decision was based on a prohibited personnel practice. *See* 5 U.S.C.A. § 7701(c)(1)(B), (2)(B). Prohibited personnel practices include discrimination "on the basis of handicapping condition, as prohibited under section 501 of the Rehabilitation Act of 1973." 5 U.S.C.A. § 2302(b)(1)(D). In so-called mixed cases—that is, cases involving an adverse personnel decision based in whole or in part on an allegedly discriminatory reason, *see* 29 C.F.R. § 1614.302(a) (2001)—the MSPB must decide both the civil service issue and the discrimination issue within 120 days after the appeal is filed. *See* 5 U.S.C.A. § 7702(a)(1). If the MSPB fails to issue a decision within this 120–day period, the employee is entitled to bring a civil action in the appropriate district court directly under § 717(c) of the Civil Rights Act of 1964, § 15(c) of the Age Discrimination in Employment Act of 1967, or § 16(b) of the Fair Labor Standards Act of 1938, as applicable. *See* 5 U.S.C.A. § 7702(e)(1)(B).

After the MSPB issues a final decision, the employee may seek judicial review of that decision. *See* 5 U.S.C.A. § 7703(a)(1).[5] Generally, the Federal Circuit has exclusive jurisdiction over appeals from decisions of the MSPB. *See* 5 U.S.C.A. § 7703(b)(1); 28 U.S.C.A. § 1295(a)(9) (West 1993); *Lindahl,* 470 U.S. at 775, 105 S.Ct. 1620; *Boylan v. United States Postal Serv.,* 704 F.2d 573, 574 n. 1 (11th Cir.1983) (per curiam). However, "[c]ases of discrimination [i.e., mixed cases] subject to the provisions of section 7702" must be filed in the appropriate district court pursuant to § 717(c) of the Civil Rights Act of 1964, § 15(c) of the Age Discrimination in Employment Act of 1967, or § 16(b) of the Fair Labor Standards Act of 1938, as applicable, within 30 days of receiving notice of the MSPB's final decision. 5 U.S.C.A. § 7703(b)(2); *see also Stephens v. Connley,* 842 F.Supp. 1457, 1459 (M.D.Ga.1994) (recognizing that district courts have jurisdiction over both components of mixed cases), *aff'd mem.,* 48 F.3d 537 (11th Cir.1995).[6] In mixed cases, the MSPB's decision concerning the discrimination issue is reviewed de novo, whereas its decision concerning the civil

---

**4.** The employee may also elect to file a complaint with the agency's Equal Employment Opportunity department, but he may not file both an EEO complaint and an appeal to the MSPB. *See* 29 C.F.R. § 1614.302(b) (2001); 5 C.F.R. § 1201.154(a) (2001). Because Plaintiff did not elect this option, the Court will not discuss it.

**5.** Alternatively, the employee may petition the EEOC to consider the MSPB's decision. *See* 5 U.S.C.A. § 7702(b); 29 C.F.R. § 1614 .303 (2001); 5 C.F.R. §§ 1201.157, 1201.161 (2001). Again, because Plaintiff did not elect this option, the Court will not discuss it.

**6.** It is important to note that mixed cases are not subject to judicial review in district court until the MSPB's final decision becomes "judicially reviewable." *See* 5 U.S.C.A.

§ 7702(a)(3). A decision becomes "judicially reviewable" as of (1) "the date of issuance of the decision if the employee or applicant does not file a petition with the Equal Employment Opportunity Commission," or (2) "the date the Commission determines not to consider the decision." *Id.* In addition, a final decision of the MSPB in a mixed case is not "judicially reviewable" in district court unless the MSPB decided the merits of both the civil service issue and the discrimination issue; in other words, the Federal Circuit retains exclusive jurisdiction if the MSPB dismissed the case on procedural or threshold grounds, such as jurisdiction, rather than on the merits. *See Ballentine v. Merit Sys. Prot. Bd.,* 738 F.2d 1244, 1246–47 (Fed.Cir.1984); *Powell v. Department of Def.,* 158 F.3d 597, 598 (D.C.Cir.1998).

service issue is reviewed under a deferential standard. *See* 5 U.S.C.A. § 7703(c); *Doyal*, 777 F.2d at 1535; *Carr v. Reno*, 23 F.3d 525, 528 (D.C.Cir.1994); *Romain v. Shear*, 799 F.2d 1416, 1421 (9th Cir.1986). Here, Plaintiff's appeal appears to be based entirely on his claim of discrimination; thus, because no civil service (i.e., non-discrimination) claim has been raised, the Court must conduct a de novo review of the MSPB's final decision. Having outlined the procedure and standard of review prescribed by the CSRA, the Court now turns to the nature of the claims asserted by Plaintiff.

■ As the Supreme Court observed in *Fausto*, "The CSRA established a comprehensive system for reviewing personnel action taken against federal employees." 484 U.S. at 455, 108 S.Ct. 668. Subsequently, the Eleventh Circuit recognized that *Fausto* "emphatically and conclusively established the preemptive nature of the CSRA." *Stephens v. Department of Health & Human Servs.*, 901 F.2d 1571, 1575–76 (11th Cir.1990). Thus, it is clear that the CSRA provides the exclusive means for a federal employee to challenge an adverse personnel action based on an alleged federal statutory or constitutional violation.

*See Fausto*, 484 U.S. at 455, 108 S.Ct. 668 (holding that the CSRA precludes judicial review under the Tucker Act for non-preference-eligible members of the excepted service, even if the CSRA does not allow administrative or judicial review of the adverse personnel action); *Lee*, 145 F.3d at 1275 (holding that the CSRA precludes a *Bivens*[7] action by a federal employee, even if the CSRA does not allow administrative or judicial review of the adverse personnel action); *Stephens*, 901 F.2d at 1575–77 (holding that the CSRA precludes both judicial review under the Administrative Procedure Act and a *Bivens* action by a federal employee); *Bush v. Lucas*, 647 F.2d 573, 577 (5th Cir. Unit B June 1981) (holding that the CSRA precludes a *Bivens* action by a federal employee), *aff'd*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983);[8] *see also Broughton v. Courtney*, 861 F.2d 639, 643 (11th Cir.1988) (holding that the CSRA preempts state common-law tort actions, to the extent that they are within the scope of the CSRA's coverage, because Congress intended for the CSRA to be the exclusive procedure for challenging federal personnel decisions).[9]

■ In light of the exclusivity of the CSRA, the complaint cannot be interpret-

7. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 396–97, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (holding that federal officials may be liable in damages for constitutional violations occurring under color of federal law).

8. The Eleventh Circuit has adopted as binding precedent all decisions issued by the former Fifth Circuit prior to October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

9. There are, of course, exceptions to this general rule. The CSRA provides that an employee may bring an action in federal court directly under an anti-discrimination statute

(1) if there is no judicially reviewable action within 120 days after the filing of (a) a complaint with the agency or (b) an appeal with the MSPB, or (2) if there is no final agency action within 180 days after the filing of a petition with the EEOC. *See* 5 U.S.C.A. § 7702(e); *see also Downey v. Runyon*, 160 F.3d 139, 145 n. 6 (2d Cir.1998). In addition, a federal employee may sue his employer in federal court directly under an anti-discrimination statute such as the Rehabilitation Act if the discrimination was not related to the appealable civil service issue. *See McAdams v. Reno*, 64 F.3d 1137, 1143–44 (8th Cir.1995). None of these exceptions apply in this case.

ed as asserting a claim under both the CSRA and the Rehabilitation Act. Instead, the complaint must be read as asserting a claim based on a violation of the Rehabilitation Act, but brought pursuant to the provisions of the CSRA, rather than as asserting a claim directly under both the CSRA and the Rehabilitation Act.[10] This is a subtle distinction to be sure, but it is one that the Court must make to remain faithful to Congress's judgment concerning the procedures for challenging personnel decisions affecting federal employees.[11]

This is not to say that the Rehabilitation Act is irrelevant in this case. Indeed, the Rehabilitation Act is highly relevant because it provides the substantive standards governing Defendant's potential liability for the alleged disability discrimination against Plaintiff. Thus, it is necessary to discuss which provisions of the Rehabilitation Act are implicated in this case.

When Congress enacted the Rehabilitation Act in 1973, it established a broad statutory scheme for protecting the rights of disabled individuals. *See* 29 U.S.C.A. §§ 701–796*l* (West 1999 & Supp.2001). Congress's stated goals behind the Rehabilitation Act include (1) "providing individuals with disabilities with the tools necessary to (A) make informed choices and decisions; and (B) achieve equality of opportunity, full inclusion and integration in society, employment, independent living, and economic and social self-sufficiency, for such individuals," 29 U.S.C.A. § 701(a)(6); (2) "empower[ing] individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society," 29 U.S.C.A. § 701(b)(1); (3) "ensur[ing] that the Federal Government plays a leadership role in promoting the employment of individuals with disabilities ... and in assisting States and providers of services in fulfilling the aspirations of such individuals with disabilities for meaningful and gainful employment and independent living," 29 U.S.C.A. § 701(b)(2); and (4) supporting the principles of (a) "respect for individual dignity, personal responsibility, self-determination, and pursuit of meaningful careers, based on informed choice, of individuals with disabilities," (b) "respect for the privacy, rights, and equal access (including the use of accessible formats), of the individuals," (c) "inclusion, integration, and full participation of the individuals," (d) "support for the involvement of an individual's representative if an individual with a disability requests, desires, or needs such support," and (e) "support for individual and systemic advocacy and community involvement," 29 U.S.C.A. § 701(c).

Neither of the two principal provisions for implementing these goals, however, created an express right of action for disabled individuals against the federal government. As originally enacted, § 501 simply required federal agencies to implement affirmative action plans to ensure that disabled individuals were provided with equal employment opportunities. *See* Pub.L. No. 93–112, § 501(b), 87 Stat. 355,

---

**10.** The exceptions identified in footnote 9 for suing directly under the relevant anti-discrimination statute are not applicable in this case.

**11.** Admittedly, the Court's conclusion that this case cannot be brought directly under the Rehabilitation Act has little significance beyond strict adherence to proper procedure because the de novo standard of review mandated by the CSRA means that there is no difference between conducting a de novo review under the CSRA and conducting an original review directly under the Rehabilitation Act.

390–91 (codified as amended at 29 U.S.C.A. § 791(b)). The other provision, § 504, originally prohibited disability discrimination by recipients of federal funds, but did not extend this prohibition to the federal government itself. *See* Pub.L. No. 93–112, § 504, 87 Stat. 355, 394 (codified as amended at 29 U.S.C.A. § 794(a)). The original language of § 501 indisputably did not create a private right of action against the federal government for disability discrimination; however, because § 504 contains different language from § 501, "all courts that considered the issue found that section 504 established a private cause of action for handicapped persons subjected to discrimination by recipients of federal funds." *Prewitt v. United States Postal Serv.,* 662 F.2d 292, 302 (5th Cir.1981).[12] In an effort to remedy these shortcomings and to strengthen the employment rights of disabled individuals, Congress amended the Rehabilitation Act in 1978 in two significant respects. *See id.* at 301–04. First, Congress expressly provided federal employees with a private right of action under § 501. *See* Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub.L. No. 95–602, § 120(a), 92 Stat. 2955, 2982 (codified at 29 U.S.C.A. § 794a(a)(1)); *Treadwell v. Alexander,* 707 F.2d 473, 475 (11th Cir.1983). Second, Congress extended the prohibition of disability discrimination in § 504 to "any program or activity conduct-

ed by any Executive agency or by the United States Postal Service." *See* Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub.L. No. 95–602, § 119(2), 92 Stat. 2955, 2982 (codified as amended at 29 U.S.C.A. § 794(a)). Thus, only since 1978 has the federal government been subject to suit under either § 501 or § 504.

■ Although it is not clear from the complaint, Plaintiff appears to have sued under both § 501 and § 504. Plaintiff unquestionably can proceed under § 501, but whether he can proceed under § 504 is not so obvious. The current version of § 504 provides that disabled individuals may not "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C.A. § 794(a). However, the definition of "program or activity," *see* 29 U.S.C.A. § 794(b), suggests that § 504 does not apply in cases alleging disability discrimination against a federal agency. Nevertheless, the Eleventh Circuit has held that § 504 creates a private right of action against federal agencies. *See Doe v. Garrett,* 903 F.2d 1455, 1461 n. 10 (11th Cir.1990).[13] While this would make it appear that Plaintiff may proceed under

---

**12.** Decisions issued by Unit A of the former Fifth Circuit after September 30, 1981, are not binding precedent in the Eleventh Circuit. *See Stein v. Reynolds Sec., Inc.,* 667 F.2d 33, 34 (11th Cir.1982). Thus, *Prewitt* is not binding precedent. Nevertheless, the Eleventh Circuit has previously looked to it for guidance. *See Treadwell v. Alexander,* 707 F.2d 473, 475 n. 4 (11th Cir.1983).

**13.** There is a substantial split of authority among the circuits on this issue. The Second, Seventh, Ninth, and Tenth Circuits have held

that § 501 provides the exclusive remedy for federal employees. *See Rivera v. Heyman,* 157 F.3d 101, 104–05 (2d Cir.1998); *Johnston v. Horne,* 875 F.2d 1415, 1420–21 (9th Cir. 1989), *overruled on other grounds by Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990); *Johnson v. United States Postal Serv.,* 861 F.2d 1475, 1477–78 (10th Cir.1988); *McGuinness v. United States Postal Serv.,* 744 F.2d 1318, 1321 (7th Cir.1984). In addition, the District of Columbia Circuit has " 'strongly sug-

§ 504, the relief he is seeking prevents him from doing so. Because money damages are not available in a claim brought against a federal agency under § 504, *see Lane v. Pena,* 518 U.S. 187, 192–94, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (holding that Congress has not adequately waived the federal government's sovereign immunity from liability for money damages under § 504), Plaintiff may proceed under § 504 only if he is seeking non-monetary relief. According to the complaint, the only non-monetary relief that Plaintiff is seeking is (1) reinstatement, (2) an injunction prohibiting any disability discrimination against him, and (3) disciplinary action against the employees who discriminated against him. Unfortunately for Plaintiff, these three forms of relief are not available because (1) Plaintiff has already been reinstated and therefore the Court lacks jurisdiction to award reinstatement, *see infra* Part III.D; (2) the Court will not issue an injunction simply prohibiting Defendant from doing that which he is already prohibited from doing by law—such an injunction would have no value because it would be redundant of what the Rehabilitation Act already prohibits; and (3) the Court has no jurisdiction to take disciplinary action against employees of the federal government. Accordingly, because the only relief sought in the complaint that is still available to Plaintiff is money damages, the Court finds that Plaintiff has no remedy under § 504 and that Plaintiff may proceed only under § 501.

To summarize, Plaintiff does not have separate claims under the CSRA and the Rehabilitation Act; instead, he has a single claim based on a violation of § 501 of the Rehabilitation Act, but brought pursuant to the CSRA. Therefore, the CSRA has no independent significance beyond providing the procedure and standard of review for evaluating Plaintiff's claim under § 501. It is this understanding of the complaint that will govern the Court's consideration of the arguments raised in Defendant's motion. The Court now turns to those arguments, with one exception. Because the CSRA does not afford Plaintiff a theory of liability independent of that provided by § 501, Defendant's eighth argument does not raise a separate issue for decision. In other words, Defendant's eighth argument is not really an "argument"; rather, it is a reason supporting Defendant's first through seventh arguments. As such, the Court will not address Defendant's eighth argument as an independent reason for granting his motion. Regardless, that argument would fail because it is based on an incorrect standard of review.

### A. Does the Federal Employees' Compensation Act Provide Plaintiff's Sole Remedy?

FECA is a comprehensive statutory scheme that operates essentially as a federal workers' compensation law, *see* 5 U.S.C.A. §§ 8101–8193 (West 1996 & Supp.2001), the purpose of which is "to provide quick and uniform coverage for work-related injuries." *Woodruff v. United States Dep't of Labor,* 954 F.2d 634, 639 (11th Cir.1992) (per curiam). It provides,

---

gest[ed]' " that federal employees should sue under § 501 rather than § 504. *See Barth v. Gelb,* 2 F.3d 1180, 1183 (D.C.Cir.1993) (quoting *Milbert v. Koop,* 830 F.2d 354, 357 (D.C.Cir.1987)) (alteration in original). However, the Third, Fifth, Sixth, and Eighth Circuits have held that a federal agency may be sued under § 501 or § 504. *See Spence v. Straw,* 54 F.3d 196, 199–200 (3d Cir.1995); *Morgan v. United States Postal Serv.,* 798 F.2d 1162, 1164–65 (8th Cir.1986); *de la Torres v. Bolger,* 781 F.2d 1134, 1135–36 & n. 1 (5th Cir.1986); *Smith v. United States Postal Serv.,* 742 F.2d 257, 259–60 (6th Cir.1984).

"The United States shall pay compensation ... for the disability or death of an employee resulting from personal injury sustained while in the performance of his duty." 5 U.S.C.A. § 8102(a). FECA furnishes the exclusive remedy against the United States for federal employees who sustain damages because of a work-related injury that is within the scope of FECA's coverage. *See* 5 U.S.C.A. § 8116(c). In addition, FECA authorizes the Secretary of Labor to grant or deny compensation awards, to modify previous compensation awards, and to grant compensation awards that were previously denied or discontinued. *See* 5 U.S.C.A. § 8128(a). Such decisions by the Secretary are final and not subject to judicial review. *See* 5 U.S.C.A. § 8128(b).

Initially, Defendant argues that the Court lacks jurisdiction because "[a] decision of the Secretary of Labor about a FECA matter, including eligibility for benefits, is not reviewable by a federal court." The Court agrees that FECA proscribes judicial review of decisions by the Secretary concerning FECA benefits, *see* 5 U.S.C.A. § 8128(b), but Plaintiff is not challenging a decision of the Secretary regarding the benefits he has received. Instead, Plaintiff is seeking different relief under different statutes for a different injury. Therefore, the jurisdictional prohibition contained in. § 8128(b) is inapplicable in this case.

Defendant's primary argument is that, despite the broad remedial purposes of the Rehabilitation Act, the exclusivity provision in § 8116(c) precludes Plaintiff's claim for disability discrimination because he has received FECA benefits for his injury. Defendant relies heavily on *Meester v. Runyon,* 149 F.3d 855 (8th Cir.1998), and *Luellen v. Henderson,* 54 F.Supp.2d 775 (W.D.Tenn.1999), for this argument. In *Meester,* the Eighth Circuit held that

> a frustrated FECA claimant cannot secure judicial review of a FECA compensation decision by claiming that the Rehabilitation Act entitles her to accommodation in performing an alternative position approved by the Department of Labor when the claim is predicated upon the same illness or injury that gave rise to the Department of Labor's initial decision.

149 F.3d at 857. Similarly, in *Luellen,* the Western District of Tennessee held that "decisions concerning the suitability of federal agency job offers to partially disabled employees have been exclusively committed to the Secretary of Labor under the FECA and cannot be collaterally attacked or reviewed under the Rehabilitation Act." 54 F.Supp.2d at 783. Contrary to Defendant's argument, however, these cases do not cast a broad prohibition over all disability discrimination claims brought subsequent to recovery of FECA benefits. For example, in *Meester,* the Eighth Circuit recognized that FECA does not preclude all discrimination claims. *See* 149 F.3d at 856–57. Furthermore, in *Luellen,* the district court limited the scope of its holding to review of decisions that have been committed exclusively to the Secretary of Labor. *See* 54 F.Supp.2d at 780–83. A broader interpretation of *Luellen* would probably run afoul of the Sixth Circuit's decision in *DeFord v. Secretary of Labor,* 700 F.2d 281 (6th Cir.1983), which the district court in *Luellen* did not even cite, though it is bound by Sixth Circuit precedent. In *DeFord,* the Sixth Circuit held,

> All of these concerns might be touched upon by noting that availability of FECA remedies should not detract from

the authority granted in 42 U.S.C. § 5851. That is to say, a broad statutory scheme giving rights generally to all federal employees should not prevent enforcement of a provision quite specifically intended to remedy unlawful discrimination.

*Id.* at 289. Thus, *Meester* and *Luellen* appear to preclude exactly what FECA itself already precludes—judicial review of decisions that have been committed exclusively to the Secretary of Labor, including compensation decisions. So characterized, the Court does not disagree with either *Meester* or *Luellen.*

Other cases cited by Defendant have more broadly prohibited discrimination claims brought subsequent to recovery of FECA benefits. *See Stubler v. Runyon,* 892 F.Supp. 228, 229–30 (W.D.Mo.1994) (prohibiting discrimination claims based on the same work-related injury for which FECA benefits were sought); *Alexander v. Frank,* 777 F.Supp. 516, 523–25 (N.D.Tex.1991) (granting summary judgment for the defendant on the plaintiff's disability discrimination claim because FECA benefits constitute the government's exclusive liability); *Black v. Frank,* 730 F.Supp. 1087, 1090–91 (S.D.Ala.1990) (holding that FECA benefits constitute the government's exclusive liability because awarding a remedy under the Rehabilitation Act would "irreconcilably conflict" with FECA).

The greater weight of authority, however, holds that recovery of FECA benefits does not bar a subsequent claim for discrimination. *See, e.g., Nichols v. Frank,* 42 F.3d 503, 515–16 (9th Cir.1994) (Title VII), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), *and Faragher v. City of Boca Ra-*

*ton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Miller v. Bolger,* 802 F.2d 660, 663–66 (3d Cir.1986) (Title VII); *DeFord,* 700 F.2d at 289–90 (anti-discrimination provision of the Energy Reorganization Act of 1974); *Dubee v. Henderson,* 56 F.Supp.2d 430, 432–34 (D.Vt.1999) (Rehabilitation Act and Title VII); *Reidy v. Runyon,* 971 F.Supp. 760, 769–71 (E.D.N.Y.1997) (Rehabilitation Act); *Karnes v. Runyon,* 912 F.Supp. 280, 284–85 (S.D.Ohio 1995) (Rehabilitation Act and Title VII); *Callanan v. Runyun,* 903 F.Supp. 1285, 1296 (D.Minn.1994) (Title VII), *aff'd,* 75 F.3d 1293 (8th Cir.1996); *Taylor v. Secretary of Navy,* 852 F.Supp. 343, 351–52 (E.D.Pa.1994) (Rehabilitation Act), *aff'd mem.,* 61 F.3d 896 (3d Cir.1995); *Johnson v. Sullivan,* 764 F.Supp. 1053, 1063 (D.Md.1991) (Rehabilitation Act and Title VII); *George v. Frank,* 761 F.Supp. 256, 258–59 (S.D.N.Y.1991) (Title VII); *Metz v. United States,* 723 F.Supp. 1133, 1135–36 (D.Md.1989) (anti-discrimination statutes generally); *Sullivan v. United States,* 428 F.Supp. 79, 81 (E.D.Wis.1977) (anti-discrimination statutes generally); *see also Jense v. Runyon,* 990 F.Supp. 1320, 1329–30 (D.Utah 1998) (holding that FECA does not bar certain tort claims); *Gergick v. Austin,* 764 F.Supp. 580, 581–82 (W.D.Mo.1991) (same); *Underwood v. United States Postal Serv.,* 742 F.Supp. 968, 970–71 (M.D.Tenn.1990) (same); *Newman v. Legal Servs. Corp.,* 628 F.Supp. 535, 543 (D.D.C.1986) (same), *disapproved on other grounds, Hall v. Ford,* 856 F.2d 255 (D.C.Cir.1988).

■ It appears that the Eleventh Circuit has never decided whether a federal employee who recovers FECA benefits is precluded from bringing a subsequent claim under the Rehabilitation Act for discrimination based on a disability that was

caused by the work-related injury for which the employee recovered FECA benefits. After carefully examining the reasoning in all the cases cited above, the Court is persuaded that FECA does not preclude such a claim. In reaching this conclusion, the Court relies on the plain language of § 8101(5) and the legislative history of § 8116(c).

■ The first canon of statutory construction is that courts should always begin the process of legislative interpretation, and should often end it as well, with the words of the statute. *See Harris v. Garner*, 216 F.3d 970, 972 (11th Cir.2000) (en banc). In other words, "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (quoting *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)). Thus, the plain meaning of the statute controls unless it is ambiguous, it would lead to an absurd result, or there is clear evidence that Congress intended a different interpretation. *See Moore v. American Fed'n of Television & Radio Artists*, 216 F.3d 1236, 1244 & n. 17 (11th Cir. 2000). FECA defines "injury" as "injury by accident, a disease proximately caused by the employment, and damage to or destruction of medical braces, artificial limbs, and other prosthetic devices which shall be replaced or repaired, and such time lost while such device or appliance is being replaced or repaired." 5 U.S.C.A. § 8101(5). This language unambiguously indicates that disparate treatment discrimination cannot, as a matter of law, fit within FECA's definition of "injury" because such discrimination is an intentional—not accidental—act,[14] is not a disease, and is not damage to or destruction of medical braces, artificial limbs, or other prosthetic devices. *See Nichols*, 42 F.3d at 515. Thus, the harm suffered by a victim of disability discrimination is not an injury within the meaning of FECA. The cases cited by Defendant are not persuasive because they fail to recognize discrimination as an injury distinct from the type of physical injuries covered by FECA. The plain language of § 8101(5) requires the Court to recognize this distinction. Moreover, because this interpretation gives effect to both FECA and the Rehabilitation Act, it cannot be considered to lead to an absurd result.

When the plain language of a statute is clear, there is no need to examine the legislative history, but the Court is nevertheless compelled to do so in this case for the sake of completeness. *See Harris*, 216 F.3d at 976–77 (recognizing that "sometimes judges who find that legislative history supports and complements the plain meaning of statutory language cannot resist the temptation to set out that history"); *id.* at 977 n. 4 ("So long as legislative history is not used to contradict the plain meaning of the statutory language, we see no inconsistency in pointing out that both the statutory language and legislative history lead to the same interpretative result."). Looking at the legislative history of § 8116(c), it is evident that Congress did not intend a result contrary to the plain meaning of the language in § 8101(5). The Senate Report that accompanied the amendment to FECA adding

---

14. Because Plaintiff has not asserted a claim for discrimination based on disparate impact, the Court offers no opinion as to whether such discrimination constitutes an injury by accident.

§ 8116(c) explained the purpose of the exclusivity provision as follows:

"Workmen's compensation laws, in general, specify that the remedy therein provided shall be the exclusive remedy." The basic theory supporting all workmen's compensation legislation is that the remedy afforded is a substitute for the employee's (or dependent's) former remedy at law for damages against the employer. With the creation of corporate instrumentalities of Government and with the enactment of various statutes authorizing suits against the United States *for tort,* new problems have arisen. *Such statutes as the Suits in Admiralty Act, the Public Vessels Act, the Federal Tort Claims Act and the like,* authorize in general terms the bringing of civil actions for damages against the United States. The inadequacy of the benefits under [FECA] has tended to cause Federal employees to seek relief under these general statutes. Similarly, corporate instrumentalities created by the Congress among their powers are authorized to sue and be sued, and this, in turn, has resulted in filing of suits by employees against such instrumentalities *based upon accidents in employments.*

This situation has been of considerable concern to all Government agencies and especially to the corporate instrumentalities. Since the proposed remedy would afford employees and their dependents a planned and substantial protection, to permit other remedies by civil action or suits would not only be unnecessary, but would in general be uneconomical, from the standpoint of both the beneficiaries involved and the Government.

．　　．　　．　　．　　．

"The saving to the Government by the elimination of costly and needless claims and litigation *under the Federal Tort Claims Act, Suits in Admiralty Act, Public Vessels Act, and the like,* which presently weigh heavily upon the Government and involve considerable expense to defend will be eliminated, offsetting in substantial part the increased cost in compensation benefits."

*Miller,* 802 F.2d at 663 (quoting S.Rep. No. 836, 81st Cong., 1st Sess. (1949), *reprinted in* 1949 U.S.C.C.A.N. 2125, 2136, 2143). As this language demonstrates, Congress designed FECA to be a substitute only for common-law tort actions. *See Avasthi v. United States,* 608 F.2d 1059, 1060 (5th Cir.1979) (citing *United States v. Demko,* 385 U.S. 149, 151, 87 S.Ct. 382, 17 L.Ed.2d 258 (1966)). Because the common law did not recognize workplace discrimination as a viable cause of action, *see Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984) (recognizing that, absent a statutory prohibition, the traditional at-will employment doctrine means that "[an] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all"); 1 Lex K. Larson, *Employment Discrimination* § 1.01 (2d ed.2001), Congress could not have intended for discrimination (i.e., a non-tort injury) to be a compensable injury under FECA. Conversely, claims brought under statutes authorizing recovery in tort against the United States are exactly what Congress intended to preclude in § 8116(c) because tort claims and FECA benefits provide the same type of relief, even if in different amounts, for the same tortious injury. *See Noble v. United States,* 216 F.3d 1229, 1234–35 (11th Cir.2000). However, anti-discrimination statutes, including the Rehabilitation Act, provide different

relief for an entirely separate injury. Therefore, the legislative history of § 8116(c) shows that Congress did not intend that recovery for tortious injury under FECA would bar claims for non-tortious injury, such as Plaintiff's claim for disability discrimination under the Rehabilitation Act.

Because § 8116(c) was enacted in 1949, Congress quite obviously made no reference in the legislative history as to the effect of the exclusivity provision on claims brought under the yet-to-be-enacted Rehabilitation Act. It is significant, however, that there appears to be no indication in the legislative history of either the Rehabilitation Act or the Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978 (which created a private cause of action against the federal government under § 501) that Congress intended for an action under § 501 to be precluded by recovery of FECA benefits. Were that Congress's intent, one would expect to find some indication in the statute itself or in the legislative history. The absence of any such indication confirms the Court's conclusion that Congress did not intend for recovery under FECA to preclude § 501 remedies for disability discrimination. *Cf. Miller,* 802 F.2d at 663–64 (reaching the same conclusion with respect to whether recovery under FECA precludes an action under Title VII).

Furthermore, the dissimilarity of relief available under FECA and § 501 means that a federal employee who recovers FECA benefits will not be fully compensated for any disability discrimination he suffers subsequent to his work-related injury unless he can also bring a claim under the Rehabilitation Act. *See id.* at 665–66. Thus, barring a federal employee who receives FECA benefits from bringing a claim under the Rehabilitation Act would frustrate Congress's purposes in enacting the Rehabilitation Act because the Rehabilitation Act provides for much greater, and different, relief than FECA. For example, the maximum that a plaintiff may recover under FECA is 75% of his salary. *See* 5 U.S.C.A. § 8112(a). A plaintiff proceeding under § 501 of the Rehabilitation Act, however, is entitled to the same remedies as are set forth in § 717 of the Civil Rights Act of 1964, including 100% of back pay, *see* 42 U.S.C.A. § 2000e–5(g)(1) (West 1994); compensatory damages, *see* 42 U.S.C.A. § 1981a(a)(2) (West 1994); and attorney fees, *see* 29 U.S.C.A. § 794a(b). *See* 29 U.S.C.A. § 794a(a)(1); *see also Miller,* 802 F.2d at 665 (discussing the differences between the relief available under FECA and Title VII).

Today's decision should in no way be construed as affecting, implicating, or contradicting the cases holding that FECA precludes a subsequent claim brought under a statute that imposes tort liability. *See, e.g., Gill v. United States,* 641 F.2d 195, 197 (5th Cir. Unit A Feb.1981) (per curiam) (holding that FECA barred the plaintiff's FTCA claim). It is undisputed that § 8116(c) prohibits the Court from awarding Plaintiff additional amounts for his work-related injury, but an award under an anti-discrimination statute is not covered by FECA because discrimination falls outside FECA's definition of "injury." Therefore, § 8116(c) does not preclude a claim brought under an anti-discrimination statute because FECA does not apply to such a claim. To hold otherwise would be a perversion of Congress's intent in enacting the various anti-discrimination statutes. It is unthinkable that Congress intended to disallow federal employees who are unfortunate enough to

have been injured on the job from availing themselves of the protections afforded by those statutes. Moreover, the Secretary of Labor's authority is not infringed by allowing a federal employee to maintain an action for disability discrimination under the Rehabilitation Act. The Secretary has awarded Plaintiff a sum to compensate him for his work-related injury, and Plaintiff is not challenging that decision. Instead, Plaintiff is seeking different relief under different statutes for a different injury. Accordingly, FECA does not preclude Plaintiff's claim under § 501 of the Rehabilitation Act.

### B. Should Any Recovery Plaintiff Receives Be Reduced by the Amount of Benefits He Has Received Under the Federal Employees' Compensation Act?

██ Defendant argues that "Plaintiff's recovery from Defendant, if any, must be reduced by the total compensation the Air Force has already paid him." Of course, if Plaintiff proves that he was the victim of discrimination, he may recover up to the full extent allowed by § 501 of the Rehabilitation Act. Section 501, through § 717 of the Civil Rights Act of 1964, *see* 29 U.S.C.A. § 794a(a)(1), allows a plaintiff to recover up to 100% of back pay, but a double recovery of back pay is specifically prohibited. *See* 42 U.S.C.A. § 2000e–5(g)(1). Therefore, as Plaintiff concedes, any back pay that he recovers must be reduced by the amount he received in FECA benefits during the relevant time period. *See Nichols,* 42 F.3d at 516. However, the amount of FECA benefits already paid to Plaintiff has no effect on any other type of relief that Plaintiff might recover, such as compensatory damages. *See id.;* 42 U.S.C.A. § 1981a(a)(2) ("[T]he complaining party may recover compensatory ... damages ... in addition to any relief authorized by [42 U.S.C.A. § 2000e–5(g)]."); 42 U.S.C.A. § 1981a(b)(2) (West 1994) ("Compensatory damages ... shall not include backpay, interest on backpay, or any other type of relief authorized under [42 U.S.C.A. § 2000e–5(g)].").

### C. Is Plaintiff Entitled to Recover Back Pay for the Time Period During Which He Was Unable or Unwilling to Work?

██ In resolving this issue, the Court is guided by the following principle: "Generally, a Title VII plaintiff can recover back pay only for the period the plaintiff is 'available and willing to accept substantially equivalent employment' elsewhere; courts exclude periods where a plaintiff is unavailable to work, such as periods of disability, from the back pay award." *Lathem v. Department of Children & Youth Servs.,* 172 F.3d 786, 794 (11th Cir.1999) (quoting *Miller v. Marsh,* 766 F.2d 490, 492 (11th Cir.1985)).[15] Defendant argues that Plaintiff was unable to work between March 1995 and February 28, 2000, and that he is therefore not entitled to an award of back pay for that period because his disability meant that he was not ready, willing, and available to accept employment. Plaintiff responds that he was in fact ready, willing, and able to work and could have returned to work if the agency would have granted him the same reasonable accommodation that it has now provided. The Court's resolution of this issue depends on whether Plaintiff was unable or unwilling to work, which in turn de-

---

15. The Court reiterates that the remedies set forth in § 717 of the Civil Rights Act of 1964 apply to claims brought under § 501 of the Rehabilitation Act. *See* 29 U.S.C.A. § 794a(a)(1).

pends on what the essential functions of Plaintiff's job were.

The Court agrees that Defendant would be entitled to summary judgment on this issue if Plaintiff had admitted that he was unable to perform the essential functions of his job, with or without a reasonable accommodation,[16] but Plaintiff has made no such admission. In fact, Plaintiff vigorously disputes Defendant's assertion that he was not able to perform the essential functions of his job, with or without a reasonable accommodation. In this regard, the Court notes that Plaintiff cannot be considered unable or unwilling to work simply because he was fired. Throughout this litigation, Plaintiff has maintained that he was ready, willing, and available to work between March 1995 and February 28, 2000, a position reinforced by his reinstatement on February 28, 2000. There is no evidence suggesting that Plaintiff was at one time unable or unwilling to work be-cause of his disability, but that his condition improved to the point that he was ready, willing, and able to work by February 28, 2000. Indeed, the evidence indicates that Plaintiff's condition was the same in March 1995 as it was on February 28, 2000. Moreover, the parties dispute what the essential functions of Plaintiff's job were, especially whether they included mobility. Because these disputes involve genuine issues of material facts, see infra Part III.E, summary judgment on this issue is inappropriate.[17] See Cramer v. Florida, 885 F.Supp. 1545, 1550 (M.D.Fla. 1995) (recognizing that "the determination of the ability to perform essential functions is generally a factual question"), aff'd, 117 F.3d 1258 (11th Cir.1997).[18]

### D. Are Plaintiff's Claims for Reinstatement and Front Pay Moot?

Under Article III of the United States Constitution, federal jurisdiction depends

---

16. As discussed in Part III.E, establishing a prima facie case of disability discrimination requires proof that the employee was able to perform the essential functions of the job, with or without a reasonable accommodation. Thus, if an employee admits that he was unable to perform the essential functions of the job, with or without a reasonable accommodation, he has necessarily admitted that he cannot establish a prima facie case of disability discrimination. Obviously, then, the employer would be entitled to summary judgment.

17. The Court acknowledges the weight of the evidence in the administrative record that supports Defendant's argument. Unlike an administrative judge, however, a district court is not permitted to weigh the evidence or make credibility determinations at the summary judgment stage. Because Plaintiff has adduced sufficient evidence to survive summary judgment, Defendant's motion must be denied as to this issue, regardless of how thorough and persuasive Administrative Judge Klein's opinion is.

18. Citing Cramer, Defendant argues in his reply brief that "if Plaintiff was able to perform the essential functions of his auditor's position from 1995 to 2000, then he would not have been entitled to workers' compensation." The Court doubts this argument because FECA is not intended to compensate only totally disabled employees of the federal government. Instead, FECA provides compensation for all work-related injuries, even those that have no bearing on the employee's ability to continue to perform the essential functions of his job. What concerns the Court is the citation to Cramer in Defendant's initial brief and reply brief. Defendant quotes the following passage from that case: "The very nature of the Workers' Compensation statute is designed to address those situations where an employee is unable to work or unable to work at his prior job and pay, because of a disability. Persons eligible for workers' compensation are not generally 'otherwise qualified' for the jobs they held prior to their disability." Cramer, 885 F.Supp. at 1550. First, by failing to identify the "Workers' Compensation statute" discussed in this quote as the Florida workers' compensation statute, not FECA, Defendant mislead the Court into thinking that Cramer was directly on point. Second, the manner in which Defendant quoted this passage suggests that the court in

on the existence of an actual case or controversy. *See* U.S. Const. art. III, § 2. The justiciability doctrines—standing, ripeness, and mootness—help determine whether there is an actual case or controversy at all times during the pendency of a lawsuit. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta,* 219 F.3d 1301, 1309 (11th Cir.2000). "The doctrine of mootness derives directly from the case-or-controversy limitation because 'an action that is moot cannot be characterized as an active case or controversy.'" *Al Najjar v. Ashcroft,* 273 F.3d 1330, 1335 (11th Cir.2001) (per curiam) (quoting *Adler v. Duval County Sch. Bd.,* 112 F.3d 1475, 1477 (11th Cir.1997)). A claim is moot if the issues are no longer live, or if the parties cease to have a legally cognizable interest in the outcome of the litigation, because the court can no longer grant any effective or meaningful relief to the prevailing party. *See id.* at 1335–36. Under this general rule, a claim is moot when the claimant receives the relief requested for that claim. *See Harrison v. United Mine Workers of Am.1974 Benefit Plan & Trust,* 941 F.2d 1190, 1193 (11th Cir.1991). When a claim becomes moot, the court is divested of jurisdiction over that claim because it fails to satisfy the case-or-controversy requirement of Article III. *See Al Najjar,* 273 F.3d at 1336.

■ Defendant argues that Plaintiff's claims for reinstatement and front pay are moot because Plaintiff was reinstated to his former job on February 28, 2000. Under the principles discussed above, Plaintiff's claim for reinstatement is quite obviously moot because he has already been reinstated. *See Musick v. Goodyear Tire & Rubber Co.,* 81 F.3d 136, 138 n. 2 (11th Cir.1996) (per curiam) (noting that reinstatement renders moot any reinstatement remedy); *Empresa Ecuatoriana De Aviacion, S.A. v. District Lodge No. 100,* 690 F.2d 838, 846 (11th Cir.1982) (holding that claims for reinstatement were rendered moot when the claimants were offered reinstatement). Indeed, Plaintiff appears to admit as much in his response brief. However, Plaintiff argues that his claim for front pay remains viable because he did not receive step increases and was not considered for promotions during the time that he was not working.

Plaintiff's argument fails to recognize that reinstatement and front pay constitute essentially the same relief—in other words, reinstatement and front pay are alternative, not cumulative, remedies. *See EEOC v. W & O, Inc.,* 213 F.3d 600, 619 (11th Cir.2000); *Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1338–39 (11th Cir.1999); *Eskra v. Provident Life & Accident Ins. Co.,* 125 F.3d 1406, 1417 (11th Cir.1997); *Wilson v. S & L Acquisition Co.,* 940 F.2d 1429, 1438 (11th Cir. 1991) (per curiam). Moreover, in wrongful discharge cases, the Eleventh Circuit prefers reinstatement to front pay unless there are extenuating circumstances that make reinstatement not feasible, ineffective, impracticable, or inadequate. *See W & O, Inc.,* 213 F.3d at 619; *Farley,* 197 F.3d at 1338 ("Previously, we have explained that reinstatement offers the most likely means of making a plaintiff whole by allowing her to continue her career as if

*Cramer* was making this statement, when in fact the passage was quoted by that court from a party's brief. The quoted sentence begins, "Additionally, the State of Florida's memorandum asserts,...." *Id.* At worst, Defendant intentionally mislead the Court; at best, Defendant carelessly drafted and edited his briefs. Both possibilities are disturbing, and neither is acceptable.

the discrimination had not occurred."). Such circumstances exist, for example, when there is discord and antagonism between the parties, when the defendant's management has intimidated or threatened the plaintiff, or when the discharge harmed the plaintiff's emotional well-being. *See W & O, Inc.,* 213 F.3d at 619; *Farley,* 197 F.3d at 1339. The fact that Plaintiff has already been reinstated shows that no extenuating circumstances exist in this case to warrant an award of front pay instead of reinstatement. Therefore, Plaintiff's claim for reinstatement and front pay is moot because there is no further meaningful relief that the Court can provide beyond that which Plaintiff already has obtained. To award Plaintiff front pay in addition to reinstatement would be an unjust double recovery.

This does not necessarily mean that Plaintiff will not be allowed to recover for lost step increases and missed opportunities for promotion. However, those items are not components of an award of front pay; instead, they are appropriately considered as part of an award of back pay. *See Bush v. Lucas,* 462 U.S. 367, 388, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) ("He also had a right to full backpay, including credit for periodic within-grade or step increases and general pay raises during the relevant period, allowances, differentials, and accumulated leave."); *EEOC v. Joint Apprenticeship Comm. of the Joint Indus. Bd. of the Elec. Indus.,* 164 F.3d 89, 102 (2d Cir.1998) ("The ordinary rule of this Circuit is that the back pay award ... should include any anticipated raises, step increases, cost of living increases, and other increases necessary to make the plaintiff whole."); *O'Neal v. Thomas,* No. 1:89–CV–218RHH, 1990 WL 304761, at *4 (N.D.Ga. Oct. 15, 1990) ("The plaintiff would also have received step increases

while an employee with the defendant. Thus, the amount of back pay is to include any step increases or raises he would have received...."). The Court intimates no view as to whether Plaintiff will recover for lost step increases or missed opportunities for promotion. Instead, the Court simply acknowledges that those items are recoverable only as a part of back pay, not front pay.

■ Finally, Plaintiff argues that his claim for front pay is not moot because there is no guarantee that the present accommodation of his disability will not be revoked. Plaintiff is correct insofar as "the mere voluntary cessation of a challenged practice does not render a case moot," but his argument fails to recognize that "voluntary cessation of a challenged practice renders a case moot only if there is no 'reasonable expectation' that the challenged practice will resume after the lawsuit is dismissed." *Jews for Jesus, Inc. v. Hillsborough County Aviation Auth.,* 162 F.3d 627, 629 (11th Cir.1998). On the present record, the Court cannot find that there is any reasonable expectation that the accommodation now being provided to Plaintiff will be revoked or that Plaintiff will be fired at the conclusion of this case. Indeed, the facts show that Plaintiff was offered his former job after the OWCP evaluated him and determined that he was able to return to work, not that he was offered his former job in response to the filing of this lawsuit. In fact, approximately four years elapsed between the date Plaintiff filed the complaint and the date the OWCP offered him the job. Of course, if the Court is mistaken—if, for example, the accommodation is revoked or Plaintiff is fired at the conclusion of this case— Plaintiff may renew his claim for reinstatement or front pay, but not both. *See id.* at 630.

### E. Was Plaintiff a "Qualified Individual" Under the Rehabilitation Act During the Relevant Time Period?

■■■■■ "To establish a prima facie case of discrimination under the [Rehabilitation] Act, an individual must show that (1) he has a disability; (2) he is otherwise qualified for the position; and (3) he was subjected to unlawful discrimination as the result of his disability." *Sutton v. Lader*, 185 F.3d 1203, 1207 (11th Cir.1999). For purposes of his summary judgment motion, Defendant does not dispute that Plaintiff is disabled within the meaning of the Rehabilitation Act, but Defendant does argue that Plaintiff was not otherwise qualified for the position between the date that he was fired and the date that he was offered reinstatement to his former job. Two questions must be answered to determine whether an individual is qualified for a job. *See Reed v. Heil Co.*, 206 F.3d 1055, 1062 (11th Cir.2000).[19] "First, does the individual satisfy the prerequisites for the position; does the individual have sufficient experience and skills, an adequate educational background, or the appropriate licenses for the job?" *Id.* "Second, can the individual perform the essential functions of the job, either with or without reasonable accommodations?" *Id.* If the answer to both of these questions is "Yes," then the individual is otherwise qualified for the position. For purposes of his summary judgment motion, Defendant does not dispute that Plaintiff satisfies the prerequisites for his job; indeed, Defendant

could not reasonably dispute Plaintiff's qualifications because Plaintiff had been employed as an auditor with the agency for approximately ten years before he was terminated. Instead, Defendant argues that Plaintiff was unable to perform the essential functions of his job, with or without a reasonable accommodation, at the time he was terminated. Thus, the threshold issue is what functions are essential to Plaintiff's job.

According to the regulations implementing Title I of the ADA,[20] the essential functions of a job are "the fundamental job duties of the employment position the individual with a disability holds or desires," but they do not include "the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1) (2001). "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors." *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir.2000). Those factors include (1) the employer's judgment, (2) the written job description, (3) the amount of time required to perform the function, (4) the consequences of not requiring the function to be performed, (5) the terms of any collective bargaining agreement, (6) the work experience of previous employees who performed the job, and (7) the current work experience of employees performing similar jobs. *See id.*

■■■■■ Applying these factors to this case yields no definitive answer. Defendant argues that the essential functions of Plaintiff's job included field work and mobility

---

**19.** Although *Reed* involved the Americans with Disabilities Act of 1990, "[d]iscrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases." *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir.2000). Therefore, "[c]ases decided under the Rehabilitation Act are precedent for

cases under the ADA, and vice-versa." *Id.* at 1305 n. 2.

**20.** Section 501 of the Rehabilitation Act incorporates the standards applied under Title I of the ADA. *See* 29 U.S.C.A. § 791(g).

and that his medical limitations prevented him from performing these functions. Plaintiff responds that he was always able to perform the essential functions of his job, even after his medical restrictions increased on April 13, 1993, because the agency defined mobility as a minor requirement, not as an essential function. Plaintiff steadfastly maintains that neither the job description nor the performance plan elements and standards identified mobility as an essential function and that the duties, elements, and standards of the job represented mental functions, not physical functions. Plaintiff is correct to an extent—with respect to the physical demands required of auditors, the job description simply provides that "[t]he work is sedentary in nature." The absence of any specified physical requirements in the job description is particularly telling in light of what the "Physical Demands" section of the job description is supposed to provide. According to the Classification Standards for the Auditing Series,

> ` The "Physical Demands" factor covers the requirements and physical demands placed on the employee by the work assignment. This includes physical characteristics and abilities (e.g., specific agility and dexterity requirements) and the physical exertion involved in the work (e.g., climbing, lifting, pushing, balancing, stooping, kneeling, crouching, crawling, or reaching). To some extent the frequency or intensity of physical exertion must also be considered, e.g., a job requiring prolonged standing involves more physical exertion than a job requiring intermittent standing.

Admittedly, however, the job description also indicates that auditors must sign a Certificate of Mobility, which the Civilian Personnel Servicing Agreement for Air Force Audit Agency Civilian Personnel requires for auditor positions that require mobility. In addition, a memorandum written on May 19, 1994, by James W. Salter, Chief of the Area Audit Office of the Air Force Audit Agency at RAFB, states that "the audit position does require walking, standing, stooping, squatting, and possibly climbing. At times, these requirements can be extensive, while at other times, the audit job involves a lot of sitting." Finally, Plaintiff conducted a survey during October and November 1993 of the professional auditors assigned to RAFB to determine the physical requirements of the audit job. The data collected by Plaintiff indicated that the job description substantially understates the physical demands associated with the auditor job. Thus, the survey concluded that "the physical requirements of auditing as identified in the AFAA's official job description is not accurate and does not reflect the actual physical requirements of auditing."

Viewed in the light most favorable to Plaintiff, this conflicting evidence creates a genuine issue of material fact as to what the essential functions of Plaintiff's job were. As a result, Defendant has not shown that Plaintiff is unable to prove the "otherwise qualified" element of the prima facie case.[21] Therefore, summary judgment on this issue is inappropriate. *See Lowe v. Alabama Power Co.,* 244 F.3d 1305, 1309 (11th Cir.2001) (holding that there were genuine issues of material fact as to what the essential functions of the plaintiff's job were); *Talavera v. School Bd. of Palm Beach County,* 129 F.3d 1214, 1220–21 (11th Cir.1997) (holding that summary judgment was precluded because genuine issues of material fact existed as

---

21. *See supra* note 17.

to whether the plaintiff's disabilities prevented her from performing the essential functions of her job with an accommodation).[22]

### F. Could Plaintiff Have Performed the Essential Functions of His Job Even with an Accommodation?

As discussed in the preceding section, there is a genuine issue of material fact as to what the essential functions of Plaintiff's job were. Therefore, it is impossible to determine whether Plaintiff could have performed the essential functions of his job, either with or without an accommodation. Accordingly, summary judgment on this issue is inappropriate.

### G. Was the Accommodation Requested by Plaintiff Unreasonable?

■ Under the Rehabilitation Act, an employer is required to provide reasonable accommodations for known disabilities of its employees unless doing so would cause an undue hardship on the employer. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir.1997). The term "reasonable accommodation" includes, among other things, both "making existing facilities used by employees readily accessible to and usable by individuals with disabilities" as well as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C.A. § 12111(9)(A), (B) (West 1995).[23] As this non-exhaustive list suggests, "under the [Rehabilitation Act] a qualified individual with a disability is 'not entitled to the accommodation of her choice, but only to a reasonable accommodation.'" *Stewart,* at 1286 (quoting *Lewis v. Zilog, Inc.,* 908 F.Supp. 931, 948 (N.D.Ga.1995)). The plaintiff in a discrimination case brought under § 501 of the Rehabilitation Act bears the burden of (1) identifying an accommodation that would enable him or her to perform the job, and (2) proving that the accommodation is reasonable. *See id.*

■ Defendant argues that Plaintiff's requested accommodation—an additional employee to help him perform field work—is unreasonable as a matter of law. This may be true under certain circumstances, but Plaintiff contends that the agency already employs people whose duties include bringing work to the auditors, that such assistance was available to other employees, that such assistance was provided to him after his first surgery, and that such assistance is now being provided to him. If this is correct, then such an accommodation might be reasonable. In addition, Plaintiff emphasizes the fact that this lawsuit could have been avoided if he would have been given the same accommodation

---

**22.** Defendant also argues that Plaintiff admitted that he was unable to perform the essential functions of his job, whatever they were, because he complained that his medical limitations were inhibiting his ability to perform certain tasks. However, without being able to define the essential functions of Plaintiff's job, the Court cannot find that the complaints cited by Defendant constitute an admission that Plaintiff was unable to perform those functions.

**23.** Again, § 501 of the Rehabilitation Act incorporates the standards applied under Title I of the ADA. *See* 29 U.S.C.A. § 791(g).

in 1995 that he is being provided with now. However, Defendant claims that Plaintiff was offered the same accommodation in 1995, but that Plaintiff refused it. Viewed in the light most favorable to Plaintiff, these disputes present genuine issues of material fact that preclude summary judgment on this issue.[24]

## IV. CONCLUSION

To summarize the Court's decision, the complaint is properly characterized as asserting a claim based on a violation of the Rehabilitation Act, but brought pursuant to the CSRA, not as asserting separate counts under both the CSRA and the Rehabilitation Act. Moreover, Plaintiff's lone claim will be governed only by § 501 of the Rehabilitation Act; Plaintiff has no claim under § 504. Because the Court has found that there are genuine issues of material fact as to (1) the essential functions of Plaintiff's job, (2) whether Plaintiff was in fact unable or unwilling to work at any time relevant to this case, and (3) the reasonableness of Plaintiff's requested accommodation, this case must now proceed to trial. Therefore, Defendant's motion is denied insofar as he has argued that Plaintiff (1) was unable or unwilling to work, (2) was not a "qualified individual" under § 501 of the Rehabilitation Act, (3) could not have performed the essential functions of his job even with an accommodation, and (4) requested an unreasonable accommodation. Defendant's motion is also denied insofar as he has argued that Plaintiff's recovery of FECA benefits precludes him from pursuing this case. However, Defendant's motion is granted (and Plaintiff's recovery at trial, if any, is limited) insofar as (1) any back pay that Plaintiff recovers must be reduced by the

amount of FECA benefits that he has already received, and (2) Plaintiff's claims for reinstatement and front pay are moot. Accordingly, Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.